# IN THE SUPREME COURT OF TEXAS

═══════════

No. 14-0107

═══════════

CUAHUTEMOC ("TIM") GONZALEZ,
PETITIONER,

v.

ERMA GONZALES RAMIREZ, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE
OF RAYMOND RAMIREZ, DECEASED, AND AS NEXT FRIEND OF R.L.R., J.R., M.R.,
R.R., AND D.R., MINOR CHILDREN; JANIE CROSBY; AND SAMUEL LEE JACKSON,
INDIVIDUALLY, AS NEXT FRIEND OF T.C.J., A MINOR CHILD, AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF REXEE JO JACKSON, DECEASED,
RESPONDENTS

═══════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS

═══════════════════════════════════════════════════════════

**PER CURIAM**

We face two questions regarding liability following an accident between a tandem truck[1] and a car. First, we consider whether the party contracting with the truck driver's employer can be held liable as a motor carrier under either the Federal Motor Carrier Safety Regulations (Federal Regulations) or their Texas counterparts (Texas Regulations). Second, we determine whether the evidence was legally sufficient to show that the same party retained sufficient control over the

_____

[1] The tandem truck is described as weighing 16,400 pounds and having a twenty-two-foot bed, three axles, and ten tires.

transportation in which the truck was engaged to owe the driver of the truck a common-law duty. We answer both questions in the negative.

Cuahutemoc ("Tim") Gonzalez, the owner and sole proprietor of Gonzalez Farms, agreed to harvest Chester Farms' silage[2] and haul it to the Littlefield Feed Yard. Gonzalez contracted with several companies to transport the silage, including 3R/Garcia Trucking, owned by Robert Garcia. Gonzalez's harvester operators loaded the trucks at the farm and signaled to the driver when the trailer was full, and the driver then delivered the load to the feed yard.

On October 5, 2009, Garcia brought to the farm several trucks he had previously used to transport the silage, along with a tandem truck and a new driver, Raymond Ramirez. On the tandem truck's first trip to the feed yard, a tire blew out, causing Ramirez to lose control and careen into oncoming traffic, colliding with the car in which Tammy Jackson and her fourteen-year-old daughter, Rexee Jo, were traveling. The collision tragically killed all three.

Samuel Lee Jackson—Rexee Jo's father and Tammy's former husband—filed suit in his individual capacity, as representative of Rexee Jo's estate, and as next friend of his minor son against Garcia and Gonzalez. As to Gonzalez, Jackson asserted direct claims for negligent overloading and negligent hiring and also sought to hold him vicariously liable for the actions of Garcia and Ramirez based on Gonzalez's alleged status as a motor carrier under both the Federal and Texas Regulations.[3]

---

[2] "Silage" is used to feed livestock and includes grass, corn, clover, and sorghum (which is the type of silage Gonzalez harvested for Chester Farms). WEBSTER'S THIRD NEW INT'L DICTIONARY 2116 (2002).

[3] Jackson's petition is not entirely clear as to negligent hiring. The cause of action is labeled as a common-law claim, but Jackson cites the Federal and Texas Regulations as support for the claim. We liberally construe Jackson's petition to include a common-law negligent-hiring claim.

Ramirez's widow, Erma Gonzales Ramirez,[4] and mother, Janie Crosby (collectively, the Ramirezes), intervened and asserted negligence claims against Gonzalez and Garcia under common-law theories of retained control over an independent contractor and joint enterprise.[5]

The Ramirezes later nonsuited their claims against Garcia. The trial court severed Jackson's claims against Garcia and rendered a default judgment against him awarding Jackson over $6 million in damages. That judgment is not at issue here. Gonzalez filed traditional and no-evidence motions for summary judgment on all claims brought by both Jackson and the Ramirezes. The trial court granted both motions as to the Ramirezes' claims and granted the no-evidence motion as to Jackson's claims. Both Jackson and the Ramirezes appealed.

The court of appeals affirmed as to Jackson's negligent overloading claim, but a divided court reversed as to the no-evidence summary judgment on Jackson's claim under the Texas Regulations and on the Ramirezes' negligence claims based on retained control, concluding that the plaintiffs had raised fact issues as to these claims.[6] 413 S.W.3d 134, 156. Gonzalez petitioned this Court for review, arguing that the court of appeals erred in holding that the evidence created a fact issue on the plaintiffs' negligence claims based on Gonzalez's retained control and status as a motor

---

[4] Mrs. Ramirez sued individually, as representative of her husband's estate, and as next friend of her five minor children.

[5] The Ramirezes later attempted to amend their petition to bring additional causes of action, including the same claims brought by Jackson under the Federal and Texas Regulations. But the court of appeals held that the amendment was untimely, and that holding has not been challenged here. 413 S.W.3d 134, 148.

[6] The court of appeals did not address Jackson's negligent-hiring claim or Gonzalez's traditional motion for summary judgment as to the Ramirezes' claims. *Id.* at 154, 156.

carrier.[7] Jackson does not seek review of the portion of the court of appeals' judgment affirming the trial court's dismissal of his negligent-overloading claim.

We first address whether Gonzalez can be held liable as a motor carrier for Jackson's damages. The Federal Regulations impose various duties on motor carriers who classify their drivers as independent contractors in order to avoid liability for the drivers' negligence. *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 37–38 (Tex. App.—Fort Worth 2002, no pet.); *see, e.g.*, 49 C.F.R. parts 376, 385, 387, 390, 391, 396. The Federal Regulations apply only to transportation in interstate commerce. *See* 49 C.F.R. §§ 387.3(a), 390.3(a). Jackson argues that, because motor vehicles are "the quintessential instrumentalities of modern interstate commerce," *United States v. Bishop*, 66 F.3d 569, 588 (3d Cir. 1995), federal law governs this matter. But the Federal Regulations specifically define "interstate commerce" as

> trade, traffic, or transportation in the United States—
> (1) Between a place in a State and a place outside of such State (including a place outside of the United States);
> (2) Between two places in a State through another State or a place outside the United States; or
> (3) Between two places in a State as part of trade, traffic, or transportation originating or terminating outside the State or the United States.

---

[7] Gonzalez also claims that the court erred in not addressing Gonzalez's traditional motion for summary judgment as to the Ramirezes' claims. Because both of Gonzalez's motions turn on the issue of retained control, and we conclude that the court of appeals erred in reversing the trial court's grant of Gonzalez's no-evidence motion for summary judgment, we need not address this issue. *See Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013) ("[I]f the non-movant fails to produce legally sufficient evidence to meet his burden as to the no-evidence motion, there is no need to analyze whether the movant satisfied its burden under the traditional motion.").

49 C.F.R. § 390.5.[8] No evidence suggests that Gonzalez hired Garcia to transport property across state lines at any point. Therefore, the Federal Regulations do not apply. *See, e.g.*, *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1205–06 (11th Cir. 2014); *Cleary v. Fed. Express Corp.*, 313 F. Supp. 2d 930, 936–39 (E.D. Wis. 2004).

Jackson alternatively argues that Gonzalez is liable as a motor carrier and employer under the Texas Regulations.[9] Texas has adopted many—but not all—parts of the Federal Regulations, as well as their federal interpretations. *See* 37 TEX. ADMIN. CODE § 4.11(a), (b)(3).[10] The Texas Regulations apply to "commercial motor vehicles" and hold "motor carriers" responsible for their "employees." *See id.* § 4.11(a); 49 C.F.R. §§ 387.1, 390.3(a), 390.11, 391.1, 396.1. Texas law defines "motor carrier" in pertinent part as "an individual . . . or other legal entity that controls, operates, or directs the operation of one or more vehicles that transport persons or cargo." TEX. TRANSP. CODE § 643.001(6); 37 TEX. ADMIN. CODE § 4.11(b)(1).

The court of appeals held that fact issues exist as to Gonzalez's status as a motor carrier and employer under the Texas Regulations, as to Garcia's and Ramirez's status as employees under the same, and, consequently, as to Gonzalez's vicarious liability for Garcia's negligence.[11] 413 S.W.3d

---

[8] In addition, "intrastate commerce" is defined as "any trade, traffic, or transportation in any State which is not described in the term 'interstate commerce.'" 49 C.F.R. § 390.5.

[9] The Texas Regulations define "interstate commerce" to include "all movements by motor vehicle, both interstate and intrastate, over the streets and highways of this state." 37 TEX. ADMIN. CODE § 4.11(b)(3).

[10] Accordingly, we look to federal case law for guidance. *R.R. St. & Co. v. Pilgrim Enters., Inc.*, 166 S.W.3d 232, 241 (Tex. 2005).

[11] In light of our holding that Gonzalez is not a "motor carrier" for purposes of these events, we need not address whether the truck at issue was a "commercial motor vehicle," whether Gonzalez meets the statutory definition of "employer," or whether Garcia and Ramirez qualify as "employees."

at 141, 145–47. In doing so, the court relied mainly on *Martinez v. Hays Construction, Inc.*, 355 S.W.3d 170 (Tex. App.—Houston [1st Dist.] 2011, no pet.), and *Castillo v. Gulf Coast Livestock Market, L.L.C.*, 392 S.W.3d 299 (Tex. App.—San Antonio 2012, no pet.).

As an initial matter, we note that this line of cases has inadvertently confused federal and state law. *Martinez* relied on *Morris* and *Sharpless v. Sim*, 209 S.W.3d 825 (Tex. App.—Dallas 2006, pet. denied), for the general proposition that "[a] motor carrier is vicariously liable for the negligence of its 'statutory employee' drivers." 355 S.W.3d at 184.[12] *Morris* addressed a situation in which a licensed motor carrier leased a tractor-trailer that was involved in an accident. 78 S.W.3d at 34–35. The court analyzed vicarious liability under Part 376 of the Federal Regulations, which governs leased and interchanged transportation equipment, and did not address possible liability under state law. *Id.* at 38 (citing 49 C.F.R. §§ 376.11–.12); *see also* 49 C.F.R. § 376.1.

*Martinez* cited *Morris*'s general proposition,[13] recognized that Texas has adopted parts of the Federal Regulations, and purported to analyze the defendant's liability as a motor carrier under state law. 355 S.W.3d at 183–87. But *Martinez* failed to recognize that the liability in *Morris* arose from sections 376.11 and .12 of the Federal Regulations, which Texas has not adopted. *See* 37 TEX. ADMIN. CODE § 4.11(a).[14] Because we have concluded that the Federal Regulations do not apply here, Gonzalez cannot be held liable under Part 376. *See Sharpless*, 209 S.W.3d at 829–30 (noting

---

[12] *Castillo*, in turn, relied on *Martinez*. 392 S.W.3d at 303.

[13] We express no opinion as to the holding in *Morris*.

[14] These provisions require a written lease for the use of the equipment. 49 C.F.R. § 376.11(a). Among other things, the lease must provide that the lessee motor carrier "shall have exclusive possession, control, and use of the equipment for the duration of the lease . . . [and] shall assume complete responsibility for the operation of the equipment for the duration of the lease." *Id.* § 376.12(c).

that the liability in *Morris* arises from Part 376). Accordingly, we disapprove of prior Texas cases to the extent they have found motor-carrier liability under the Texas Regulations based on duties created by Part 376 of the Federal Regulations, and the court of appeals erred in finding potential liability under the same here.

However, Jackson alternatively argued in the trial court and court of appeals that Gonzalez breached duties imposed on motor carriers by parts of the Federal Regulations that, unlike Part 376, have been adopted in Texas.[15] Accordingly, we will address Gonzalez's assertion that no evidence supports his liability as a motor carrier under those provisions. Applying Texas law, the court of appeals concluded that a fact issue existed as to Gonzalez's status as a motor carrier. 413 S.W.3d at 141–45.

We review the evidence presented by a no-evidence motion for summary judgment and response "in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006).

As discussed above, Gonzalez was a "motor carrier" under the Texas Regulations if he "control[led], operate[d], or direct[ed]" the operation of the truck. TEX. TRANSP. CODE § 643.001(6). In analyzing whether a defendant is a motor carrier, we focus on the specific transaction at issue. *See Camp v. TNT Logistics Corp.*, 553 F.3d 502, 507 (7th Cir. 2009); *Harris*

---

[15] 37 TEX. ADMIN. CODE § 4.11(a) (adopting, *inter alia*, parts 385, 387, 390, 391, and 396 of the Federal Regulations).

*v. Velichkov*, 860 F. Supp. 2d 970, 979 (D. Neb. 2012) (holding that FedEx's authority to operate as a motor carrier was irrelevant in determining whether FedEx actually acted as a motor carrier).

In *Martinez*, Hays controlled the worksite and was ultimately responsible for hauling the dirt, but exercised no control over the route drivers took or which driver operated a particular truck. 355 S.W.3d at 185. However, when a driver reported to Hays, Hays checked the driver's proof of insurance and license, provided a hauling permit to the driver, loaded the dump truck, and informed the driver of the destination; upon delivery, the driver was given a receipt that he returned to Hays, and Hays indirectly paid the driver on a per-load basis. *Id.* at 174, 185. The court held that there was a fact issue whether Hays controlled, operated, or directed the operation of a truck involved in an accident while hauling the dirt. *Id.*

In *Castillo*, the court reached the opposite conclusion. 392 S.W.3d at 306. As Hellen, a Gulf Coast contractor driving a truck owned by a third party, backed the truck into Gulf Coast's designated unloading area at a livestock auction barn, he struck and injured Castillo. *Id.* at 301. Gulf Coast's website stated that hauling was available, but Gulf Coast explained that this meant only that Gulf Coast could find a truck and a driver when the cattle owner could not transport the cattle to the auction barn. *Id.* at 304–05. Gulf Coast did not perform the loading or direct the size of the load, direct the route to be taken by the drivers, or exercise any other control over the trucks or the drivers as they transported the livestock. *Id.* at 305. Although Gulf Coast's employees unloaded the livestock on Gulf Coast's premises, this was done only after the truck was parked in the unloading area. *Id.* at 305–06. Contrasting *Martinez*, the court held that Castillo presented no evidence that Gulf Coast controlled, operated, or directed the operation of the truck. *Id.* at 306.

Here, in holding that the evidence presented a fact issue as to Gonzalez's motor-carrier status, the court of appeals focused on the evidence that Gonzalez told the drivers where to pick up and deliver the silage, loaded the trucks and signaled when done, had the right to refuse to load a truck, and was "ultimately responsible" for getting the silage to the feed yard under his agreement with Chester Farms. 413 S.W.3d at 144-45 (citing *Martinez*, 355 S.W.3d at 185). In addition, Jackson notes that Gonzalez hired and paid Garcia to haul the silage and asked him to bring a tandem truck, and that Gonzalez held a motor-carrier license at the time of the accident.

Like the defendant in *Martinez*, Gonzalez controlled the loading site, was ultimately responsible for the hauling as part of an underlying agreement, and loaded the trucks, but did not control what driver operated a particular truck or what route the drivers took. Unlike *Martinez*, however, Gonzalez had nothing to do with verifying drivers' insurance and licenses or providing hauling permits, nor did he establish the manner or method of the drivers' payment. Thus, the facts that directly implicated control of the actual *transportation* of the property in *Martinez* are notably absent here.[16] *See Velichkov*, 860 F. Supp. 2d at 979 (noting that the Federal Regulations "are applicable to those who transport property, not those who send or receive it").

Although the district court in *Velichkov* analyzed motor-carrier status under the Federal Regulations, we find the reasoning in that case instructive. There, FedEx contracted for transportation services with Fresh Start, which in turn hired Velichkov to drive the truck. *Id.* at 973. The court held that the plaintiffs' attempt to "'bootstrap' FedEx into 'motor carrier' status by

---

[16] While the fact that Gonzalez's harvesters loaded the truck is relevant to Jackson's negligent-overloading claim, that claim is no longer at issue.

9

stretching the regulatory language fails because the definitions of motor carrier and employer . . . describe precisely the role assumed by Fresh Start in this instance as an independent contractor." *Id.* at 980. Because Fresh Start assumed the pertinent motor-carrier duties, the plaintiffs were not deprived of their remedy. *Id.* The court declined to burden FedEx with the regulatory duties to conduct road tests and retain records for drivers with whom it had no relationship just because it had the ability to act as a motor carrier.[17] *Id.*

Under the circumstances presented here, where Jackson has shown only that Gonzalez told Garcia where to pick up and deliver—which any hauler would need to know[18]—and loaded the trucks, Gonzalez was acting as a shipper, not a motor carrier. *See id.* It therefore makes no sense to burden Gonzalez with the many duties already placed upon Garcia.[19] *See id.* (finding that FedEx was acting as a shipper under the circumstances). Jackson presented no evidence that Gonzalez exercised any control over the trucks or the drivers as they transported the silage to the feed yard. *See Castillo*, 392 S.W.3d at 305. Nor, as discussed above, did Gonzalez select the particular trucks Garcia used. Accordingly, even in the light most favorable to Jackson, no evidence shows that Gonzalez controlled, operated, or directed the operation of the trucks involved in the hauling

---

[17] To that end, we note that Gonzalez's possession of a motor-carrier license is irrelevant in determining whether he acted as a motor carrier with respect to this incident. *See Camp*, 553 F.3d at 507; *Velichkov*, 860 F. Supp. 2d at 979.

[18] As the dissent in the court of appeals aptly noted, "[s]urely virtually every person who finds it necessary to hire a truck to haul a cargo also must tell the trucker where to get the cargo and where to haul it." 413 S.W.3d at 157 (Campbell, J., dissenting); *see also Schramm v. Foster*, 341 F. Supp. 2d 536, 550 (D. Md. 2004) (instructing driver as to time and place of pick-up and delivery does not amount to an assumption of control or motor-carrier responsibility).

[19] As noted above, the trial court rendered a default judgment against Garcia for several million dollars for breaching these duties.

operations at issue. *See* TEX. TRANSP. CODE § 643.001(6). The trial court properly rendered summary judgment on Jackson's claims against Gonzalez under the Texas Regulations.

We turn next to the Ramirezes' claim that Gonzalez breached common-law duties he owed Ramirez as the employee of an independent contractor. Generally, an owner or general contractor does not owe a duty to its independent contractor's employees to ensure that they safely perform their work. *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 & n.1 (Tex. 1999) (noting that a general contractor "owes the same duty as a premises owner to an independent contractor's employee"). But an owner or general contractor can be held vicariously liable for its independent contractor's actions if the owner retains some control over the manner in which the contractor performs the work that causes the damage. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791 (Tex. 2006). In discussing retained control, we explained in *Chapa*:

> [A] general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations . . . does not mean that the [independent] contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the [independent] contractor is not entirely free to do the work in his own way.

11 S.W.3d at 155 (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)). In turn, an owner or general contractor "can direct when and where an independent contractor does the work and can request information and reports about the work" without assuming vicarious liability. *Fifth Club*, 196 S.W.3d at 792.

In limiting liability in this way, we have explained that imposing liability on owners and general contractors who stop work perceived as unsafe "would deter [them] from setting even

minimal safety standards." *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 607–09 (Tex. 2002) (holding that the right to preclude work from beginning and the implementation of a safe-work permit system were insufficient to establish actual control); *see also Chapa*, 11 S.W.3d at 156 (holding that instructions to perform work in a safe manner and the authority to stop dangerous conduct was no evidence of actual control). We "have never concluded that a general contractor actually exercised control . . . [when] there was no prior knowledge of a dangerous condition and no specific approval of any dangerous act." *Bright*, 89 S.W.3d at 609. And the "possibility of control is not evidence of a 'right to control' actually retained or exercised." *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999).[20]

Here, the Ramirezes point to the following evidence to show Gonzalez's control over Garcia's work:

- Garcia's testimony that "[Gonzalez] told me to take those particular trucks. . . . That particular truck, he told me." But Garcia explained that this was "the only time that [Gonzalez] ever told me to bring the tandem trucks," and that Gonzalez said: "'*If you want to* bring your tandem trucks when we get started back again, *if you want to* bring your tandem trucks, bring them because . . . the field that we are about to get into is really sandy and we are going to need your tandems.' And that's when he told me to bring them." (Emphasis added).

- Garcia's testimony that 3R/Garcia was obedient to Gonzalez's suggestions, which needed to be followed: "We would just bring whatever he told us. . . . They are the bosses, you know, so we will do what they say."

---

[20] *See also Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 702–03 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding that a general contractor's right to forbid the work from being performed in a dangerous manner, and the fact that he would have stopped the work and required protective equipment had he seen the employee of the independent contractor not using such equipment, merely showed the possibility of control, not actual control).

- Garcia's affidavit stating that (i) he and Gonzalez have to agree about what trucks to use, (ii) they both approved the use of the tandem truck, and (iii) Gonzalez had more control over the cutting operations, while Garcia had more control with respect to the hauling operations.

- Gonzalez's testimony that (i) he makes the decision whether to load a truck; (ii) the trucks looked up-to-date from a distance, and Gonzalez would not hire someone with unsafe trucks; (iii) in Gonzalez's absence, his brother Javier takes over his responsibilities and authority; and (iv) had he seen the condition of the truck on the date of the incident, he would not have loaded the truck because he "would have recognized the condition of the tandem as being dangerous."

- Javier's testimony that Gonzalez approves only safe trucks.

Even with every reasonable inference in favor of the Ramirezes, all this evidence shows is that Gonzalez *could* refuse to load a truck, that he knew about the tandem truck's condition only *after* the accident, that Garcia exercised more control over the transportation of the silage, that Gonzalez suggested but did not require that Garcia bring tandem trucks in light of the conditions at Chester Farms,[21] and that Gonzalez did not request any particular truck but rather suggested a particular type of truck based on the conditions at the loading site.[22]

If the fact that the general contractor is the "boss" of a subcontractor were enough to create liability, the requirement of control would be obsolete.[23] Similarly, someone hiring a subcontractor to transport something will often need to specify what type of vehicle may be needed. It takes a

---

[21] Garcia testified Gonzalez told him that tandem trucks would do better than bigger trucks, which would risk getting stuck in the sandy field during the loading process.

[22] It is undisputed that it was the condition of the tire, not the type of truck, that caused the accident.

[23] The Ramirezes also rely on Gonzalez's testimony that he had a financial interest in making sure the silage made it to the destination, that he did not tell Chester Farms that he would be hiring other drivers, and that background checks are important. This is no evidence of control. Every contractor has a financial interest in a subcontractor's performance, and a background check is relevant to a negligent-hiring analysis, which is not before us. *See Fifth Club*, 196 S.W.3d at 796 (addressing background checks in the context of a negligent-hiring claim).

13

logical leap to conclude that Gonzalez's unexercised general right to refuse to load an unsafe truck and his suggestion of a particular type of truck prevented 3R/Garcia from performing the work in its own way. Accordingly, no evidence supports the Ramirezes' assertion that Gonzalez owed Ramirez a common-law duty.

We hold that the court of appeals erred in partially reversing the trial court's no-evidence summary judgment. We grant the petition for review, and, without hearing oral argument, we (1) reverse the court of appeals' judgment in part, (2) render judgment for Gonzalez on the Ramirezes' claims and on Jackson's claims asserted under the Federal and Texas Regulations, and (3) remand this case to the court of appeals to consider only Jackson's negligent-hiring claim.[24] TEX. R. APP. P. 59.1.

**OPINION DELIVERED:** May 8, 2015

---

[24] The remand encompasses only the common-law negligent-hiring claim. To the extent Jackson asserts statutory or regulatory bases for this claim under the Federal or Texas Regulations, we have already addressed those in this opinion.

14