

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-16-00107-CV

Jose **VILLARREAL** and Delia Margarita Villarreal,
Individually and on behalf of the Estate of Jose Angel Villarreal,
Appellants

v.

**CHESAPEAKE OPERATING, LLC**, Individually and d/b/a Chesapeake Operating, Inc.,
Appellee

From the 365th Judicial District Court, Dimmit County, Texas
Trial Court No. 14-06-12309-DCV-AJA-1
Honorable Amado J. Abascal, III, Judge Presiding

Opinion by:   Patricia O. Alvarez, Justice

Sitting:       Patricia O. Alvarez, Justice
              Luz Elena D. Chapa, Justice
              Jason Pulliam, Justice

Delivered and Filed:  September 21, 2016

AFFIRMED

Appellants Jose Villarreal and Delia Margarita Villarreal, individually and on behalf of the

Estate of Jose Angel Villarreal, sued several defendants, including Chesapeake Operating, LLC,

individually and d/b/a Chesapeake Operating, Inc., after their son died in a one-vehicle rollover

accident while driving a truck for Padco Energy Services, LLC.  Chesapeake filed a traditional and

no evidence motion for summary judgment challenging the duty, breach, and causation elements

of the negligence claim asserted by the Villarreals against Chesapeake.[1] The trial court granted Chesapeake's motion and severed the Villarreals' claim against Chesapeake from their claims against the other defendants. The Villarreals appeal, asserting the trial court erred in granting the motion. We affirm the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

Jose Angel Villarreal was employed by Padco as a truck driver. On the day of the accident, Angel and three other employees were sent to pick up equipment from Chesapeake's well site. Angel was assigned the responsibility to pick up two forklifts and one manlift. Upon arriving at the well site, Padco's employees were instructed to leave one of the forklifts at the well site. Angel loaded and secured a forklift and manlift onto a trailer attached to the truck he was driving. On the return drive, the truck rolled over, and Angel died at the accident scene. The investigating officer's Texas Peace Officer's Crash Report provided that Angel "was traveling at an unsafe speed for the conditions of the roadway and weight of cargo on flatbed."

In their subsequent claim against Chesapeake, the Villarreals alleged Chesapeake retained control over the manner in which Padco's employees performed their work while on Chesapeake's premises by requiring the Padco employees to attend Job Safety Analysis ("JSA") meetings whenever the Padco employees came onto Chesapeake's premises. The Villarreals further alleged:

> . . . . Because Chesapeake retained the power to direct Padco employees regarding safe practices while they are on the Chesapeake job site, Chesapeake owed a legal duty to Angel to instruct him on the safe method for loading and securing heavy equipment while he was on the Chesapeake well site. Chesapeake breached that legal duty by not performing a JSA with Angel on the day of the accident when he was there to pick up the forklift and manlift.

Finally, the Villarreals alleged:

---

[1] Chesapeake also challenged the Villarreals' gross negligence claim; however, the Villarreals do not appeal the granting of Chesapeake's summary judgment motion as to that claim.

DEFENDANT CHESAPEAKE is directly liable to Plaintiffs for negligence in failing to conduct a JSA meeting with Angel on the day of the accident when he arrived at the Chesapeake well site to pick up the manlift and forklift. Had Chesapeake performed the JSA meeting, it would have ensured that the manlift and the forklift would not have been loaded on a single trailer and ensured that the equipment that was loaded would have properly and adequately secured.

As previously noted, Chesapeake filed a traditional and no-evidence motion for summary judgment which the trial court granted. The Villarreals appeal.

## STANDARD OF REVIEW

An appellate court reviews a trial court's granting of a summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a traditional motion for summary judgment, the movant must show "there is no genuine issue as to any material fact and the [movant] is entitled to judgment as a matter of law[.]" TEX. R. CIV. P. 166a(c); *see also Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005). "A no evidence motion for summary judgment must be granted if, after an adequate time for discovery, the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial and the nonmovant fails to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact on those elements." *Medistar Corp. v. Schmidt*, 267 S.W.3d 150, 157 (Tex. App.—San Antonio 2008, pet. denied); *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) ("[m]ore than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions") (internal citations omitted); TEX. R. CIV. P. 166a(i). In reviewing a summary judgment, we take as true all evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004).

## EVIDENCE BEFORE THE TRIAL COURT

In their first issue on appeal, the Villarreals contend the trial court erred in relying on evidence attached to a supplemental motion for summary judgment filed by Chesapeake. The Villarreals assert the trial court could not consider that evidence because it was filed less than twenty-one days before the trial court's hearing on Chesapeake's motion.[2]

"Texas Rule of Civil Procedure 166a(c) permits the late filing of summary judgment proof with leave of court." *Garcia v. Garza*, 311 S.W.3d 28, 36 (Tex. App.—San Antonio 2010, pet. denied); *see also Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex. 1996) ("Summary judgment evidence may be filed late, but only with leave of court."); TEX. R. CIV. P. 166a(c). Unless the record indicates the trial court granted leave, an appellate court will presume the trial court did not consider untimely summary judgment evidence. *Alphaville Ventures, Inc. v. First Bank*, 429 S.W.3d 150, 154 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Pink v. Goodyear Tire & Rubber Co.*, 324 S.W.3d 290, 294 (Tex. App.—Beaumont 2010, pet. dism'd). The trial court's permission or leave to file untimely summary judgment evidence may be reflected in a separate order, a recital in the summary judgment, or an oral ruling in the reporter's record of the summary judgment hearing. *Alphaville Ventures, Inc.*, 429 S.W.3d at 154; *Neimes v. Ta*, 985 S.W.2d 132, 138 (Tex. App.—San Antonio 1998, pet. dism'd by agr.). In this case, the trial court's order recites the trial court considered "the pleadings, motion, responses, and evidence on file." Because the evidence attached to the supplemental motion was on file before the trial court's

---

[2] The Villarreals also contend the trial court erred in considering new grounds asserted in Chesapeake's supplemental motion for summary judgment and in its reply to the Villarreals' response to Chesapeake's original motion. The Villarreals do not, however, explain which grounds they believe to be new grounds. Having reviewed the supplemental motion and reply, it appears the Villarreals' complaint is directed at Chesapeake's reference to chapter 95 of the Texas Civil Practice and Remedies Code. Because our disposition of this appeal does not require us to consider chapter 95, we need not determine whether the trial court could properly have considered chapter 95 as a ground for summary judgment. We do note, however, that chapter 95 only applies to a claim "that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement." TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(2) (West 2011).

hearing, the recital reflects the trial court granted Chesapeake leave to file the untimely summary judgment evidence. *See Pink*, 324 S.W.3d at 294–95 (holding recital that trial court considered "all of the evidence on file" when it granted the summary judgment indicated the trial court considered evidence attached to a late-filed response).

Whether to grant leave to file untimely summary judgment evidence is within the trial court's discretion; therefore, we would not reverse the trial court's decision to grant leave absent an abuse of discretion. *See Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 686 (Tex. 2002); *Garcia*, 311 S.W.3d at 36. Aside from noting the evidence was untimely filed, the Villarreals do not argue the trial court abused its discretion in granting leave to file the untimely evidence or provide any authority to support such an argument. "It is appropriate for the trial court to grant leave for the late filing of summary judgment proof when the summary judgment movant is attempting to counter arguments presented in the nonmovant's response." *Garcia*, 311 S.W.3d at 36. Because the Villarreals have not argued or established the trial court abused its discretion in granting leave to file the untimely summary judgment evidence in this case, the Villarreals' first issue is overruled, and this court can properly consider the evidence on file that was attached to Chesapeake's supplemental motion for summary judgment.

### DUTY

In their second issue, the Villarreals assert the trial court erred in granting Chesapeake's traditional summary judgment which challenged the existence of a legal duty by Chesapeake to ensure Angel properly loaded and secured the manlift and forklift on his trailer. The Villarreals contend Chesapeake owed Angel a legal duty to instruct him with regard to a safe method for loading the equipment because Chesapeake retained the power to direct Padco employees regarding safe practices. Chesapeake responds the evidence conclusively establishes that it did not retain sufficient control over Angel's work to owe him a legal duty.

**A.      Applicable Law**

"Negligence actions in Texas require a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach." *Nabors Drilling U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009) (internal citations omitted).  Whether a duty exists is a question of law for the court. *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 209 (Tex. 2015); *Nabors Drilling U.S.A., Inc.*, 288 S.W.3d at 404.

Generally, a premises owner "does not owe a duty to its independent contractor's employees to ensure that they safely perform their work." *Gonzalez v. Ramirez*, 463 S.W.3d 499, 506 (Tex. 2015).   An owner can, however, "be held vicariously liable for its independent contractor's actions if the owner retains some control over the manner in which the contractor performs that work that causes the damage." *Id*.  "[M]erely exercising or retaining a general right to recommend a safe manner for the independent contractor's employees to perform their work is not enough to subject a premises owner to liability." *Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999).   For example, a premises owner "does not incur a duty to an independent contractor's employees to intervene and ensure that they safely perform their work" "merely by placing a safety employee on the work site." *Id*. at 157.  Similarly, the issuance of various safety manuals and standards that an independent contractor's employees are required to read and follow does not establish sufficient control. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 610–11 (Tex. 2002).  Instead, a duty only arises if the premises owner retains such a right of supervision that the premises owner controls the method of work or its operative details to such a degree that the contractor is not entirely free to do the work in its own way. *Koch Refining Co.*, 11 S.W.3d at 155–56.

**B.**      **Summary Judgment Evidence**

In the present case, the summary judgment evidence included the master service agreement between Chesapeake and Padco which stated that in performing work for Chesapeake, "Contractor [Padco] shall be deemed to be an independent Contractor, with the authority and right to direct and control all of the details of the work," and "Company [Chesapeake] shall have no right or authority to supervise or give instructions to the employees, agents, or representative of Contractor, and such employees, agents or representatives at all times shall be under the direct and sole supervision and control of Contractor."  The summary judgment evidence also included the deposition testimony of Angel's co-worker who testified Angel loaded and secured the manlift and forklift by himself without any assistance.

In their response, the Villarreals proferred excerpts of the deposition testimony of Angel's supervisor Thomas Cobb.  In their brief, the Villarreals contend Cobb testified all Padco employees are required to attend Job Safety Analysis meetings conducted by Chesapeake's company men "every time" Padco employees go to a Chesapeake job site, and "a JSA meeting involves teaching 'all the safety precautions that go with the job at hand.'"  In the excerpts proferred by the Villarreals, Cobb testified as follows:

[Excerpts from deposition pages 24 - 27]

A.      And it's a job safety analysis.  And you—hard hat, safety glasses, H2S monitors, everything that you have to have to do — to be on that location, you know, medical services, GPS coordinates for the location, that type of stuff, and—yes.

Q.      And Chesapeake required you to attend those—

A.      Not required.

Q.      — those meetings?

A.      If you were on location and one was going on, yes, everybody that pulls in on location has to stop and attend the JSA.

Q.      Okay.  And that's what I was asking about is why did you attend those?

A. Because it was a requirement.

Q. By whom?

A. Chesapeake.

Q. Okay.  And if you—and that's only if you were on the location?

A. If there was one going on on the location.  If there was a safety officer from Chesapeake there doing a setup and he was doing a JSA, every company has to have their own JSA and every company when he's doing his JSA, you have to stop and do the JSA.  And while he's there on location, if you pull on location and the JSA with the other guys are done, he'll pull you in to the cool down trailer and you'll do a JSA with him personally.

Q. Okay.  Who was—

A. Nobody.

Q. I'm sorry to interrupt.  Go ahead.

A. It's Freddy Sims.

Q. Okay.  Is the guy conducting the JSA's?

A. Well, not just Freddy.  There's several different—there's a couple different guys that done the JSA's when we were doing setup but usually when we rig down equipment to haul off, there's usually no Chesapeake company man or anybody there.

  . . . .

A. The company men themselves would do JSA's but during job, you know, shift change, like, 6:00 to 6:00 — 6:00 a.m., 6:00 p.m., 6:00 a.m. — or 6:00 p.m.  6:00 a.m. at 6:00 p.m. every day there was a JSA done for the night shift; 6:00 a.m. for the day shift every day.

Q. And, Mr. Cobb, what I'm trying to get at is I'd like the names of people, of every person that did a JSA that a Padco employee had to attend.

A. Oh, sir, I couldn't give you all that.

   MR. ESPEY:  Well, yeah.  Objection, form.

Q. (BY MR. GARCIA)  And you've named a couple.

A. That was just the setup guys that we worked with.

Q. What is a setup guy?

A. There was a setup company man where he would be there and he'd tell you, I want a light plant here, a light plant there, travel trailers here, trash trailer here, cool down trailer over here.

Q. Okay.  Give me the names of those guys.

A. Freddy Sims and Sam Hutchins.

Q. Just those two?

A.    Yes, sir.

Q.    Okay.  Did Angel have to go through any of these JSA's?

A.    Yes.  I'm—I'm sure he did on our setups because he hauled equipment to setups, yes, sir.

Q.    So anytime he hauled equipment to a Chesapeake well site, he had to undergo a JSA?

A.    Yes, sir.

      . . . .

      . . . cone and chocks out when you park a truck and trailer, just all the safety precautions that—that go with the job at hand.

Q.    What information would be relayed in a JSA as it pertains to Padco's pick up of equipment from a job site?

A.    PPE, hand and body placement, stuff like that.

Q.    And PPE is personal—

A.    Personal protection equipment.

Q.    Is there any other information besides personal protective equipment or hands —what'd you say?

A.    Yes, ma'am.  I mean, stay away from the wellhead.  You know, is there high pressure? Everything—I mean, all of that, it comes with the—on a JSA.

Q.    Right.  And I'm specifically, though, asking about the JSA as it pertains to Padco and picking up of equipment from a job site and I'd like for you to be as detailed as possible as to what is addressed in a JSA that would pertain to that procedure, if any?

A.    I can't tell you off the top of my head.  I—I mean—

Q.    Well, is there anything in a JSA that pertains to Padco's picking up equipment from a job site?

A.    I don't know ma'am.

Q.    Do you have any personal knowledge as to whether there was a company man on the job site when the Padco crew arrived on April 9th?

A.    Yes, I believe there was.

Q.    Do you know the name of that individual?

A.    No — no, ma'am, I don't.

Q.    Do you know what interaction the Padco employees had with the company man on the job site?

A.    Other than—

      MR. GARCIA:  Objection, form.

- 9 -

A.    —checking in—checking out, I don't—I don't know what—

Q.    I'm sorry.  Say again.

A.    I don't know what interaction they would have with them, just to announce their presence on-site, so.

In response to this testimony, Chesapeake proferred the deposition testimony of Padco's owner who testified as follows:

Q.    The safety meetings that you went to that were Chesapeake-hosted, did any of those have to do with the loading and unloading of heavy machinery from a flatbed or lowboy trailer?

A.    No.

## C.    Analysis

Initially, we question whether the summary judgment evidence establishes that Padco employees were required to attend JSA meetings when they picked up equipment as opposed to when they delivered equipment for setup.  Even assuming such meetings were held when Padco employees picked up equipment, the summary judgment evidence establishes the JSA meetings did not include instructions on how to safely load and secure equipment to a trailer.  Furthermore, even if the JSA meetings generally discussed "safety precautions" that related to the "job at hand" for Padco employees, Chesapeake controlled when the JSA meetings were conducted, and its holding JSA meetings in the past did not require Chesapeake to hold a JSA meeting when Angel and the other Padco employees arrived on the well site to pick up equipment.  Finally, requiring Padco employees to attend JSA meetings conducted when Padco employees were on a well site is not a retention of such a right of supervision that Chesapeake controlled the method of Padco's work or its operative details to such a degree that Padco employees were not entirely free to do the work in their own way.  *See Koch Refining Co.*, 11 S.W.3d at 155–56.  Accordingly, because the summary judgment evidence conclusively established that Chesapeake did not owe Angel a duty

to ensure that he properly loaded and secured the manlift and forklift on his trailer, the trial court did not err in granting summary judgment on this basis.[3]

## CONCLUSION

Having overruled each of the issues raised on appeal, the trial court's order is affirmed.

Patricia O. Alvarez, Justice

---

[3] Because we affirm the summary judgment on this ground, we do not address the Villarreals' remaining issues challenging the other grounds on which the trial court could have granted summary judgment because the resolution of those issues is not necessary to the disposition of this appeal. TEX. R. APP. P. 47.1.