**AFFIRMED and Opinion Filed August 18, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00665-CV

### UNITED RENTALS NORTH AMERICA, INC., Appellant
### V.
### PAMELA EVANS, INDIVIDUALLY AND AS ADMINISTRATOR FOR THE ESTATE OF CLARK BRANDON DAVIS, AND DOMINIC JONES, Appellees

### On Appeal from the 191st Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-15-04449

## OPINION

Before Justices Pedersen, III, Reichek, and Carlyle
Opinion by Justice Reichek

Clark Brandon Davis was killed when a bridge beam collapsed on his vehicle as he was driving southbound on Interstate 35 through a construction zone near Salado, Texas. The beam fell after the bridge was struck by a northbound tractor–trailer truck carrying an oversized piece of equipment loaded by United Rentals North America, Inc.'s San Antonio facility.

Davis's mother and son, Pamela Evans and Dominic Jones, filed a wrongful death and survival action against several defendants, including the owner and driver

of the tractor-trailer truck, several entities involved in the construction of the bridge over I-35, and United Rentals. Before and during trial, all defendants settled or were dismissed except United Rentals. Following a trial that lasted several days, the jury found United Rentals negligent, apportioned its responsibility for damages at 30%, and awarded $1.6 million to Jones for past and future loss of companionship/society and mental anguish; $2.7 million for past and future loss of companionship/society and mental anguish damages to Evans; and $5 million to Davis's estate for Davis's conscious pain and mental anguish prior to death. The trial court rendered judgment in accordance with the jury's verdict, reducing Evans's damages to $810,000, Jones's damages to $480,000, and the estate's damages to $1.5 million, and awarded pre- and post-judgment interest.

On appeal, United Rentals generally challenges (1) the sufficiency of the evidence to support the jury's findings on negligence and Davis's conscious pain and anguish, (2) the trial court's *Batson*[1] rulings, and (3) evidentiary and charge rulings related to an expert's testimony concerning the Texas Administrative Code (TAC). For the reasons set out below, we overrule all issues and affirm the trial court's judgment.

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

FACTUAL BACKGROUND

1. **Transport of the Boom Lift**

United Rentals is the largest equipment rental company in the world with more than 100 branches in Texas alone. In March 2015, it was "defleeting" some locations and arranged to transport two pieces of equipment—a forklift with a boom arm and a Genie S-125 boom lift—from its branch in San Antonio to its branch in Irving, Texas, where there was a greater need. The forklift—at 8 feet, 3 inches in height—was considered an ordinary-sized load and could be transported on a flatbed trailer. The boom lift, however, was 10 feet, 1 inch in height; consequently, it was considered an "oversized" load if transported on a flatbed trailer and thus would require a permit from the Texas Department of Motor Vehicles. United Rentals' own internal Transportation Guide showed the maximum load height for a flatbed trailer as 8.5 feet. To transport the boom lift without a permit, it needed to be transported on a different kind of trailer with a lower deck, such as a lowboy, drop deck, or RGN trailer.

United Rentals posted the equipment for transfer with a third-party company to be bid on by brokers, who, in turn, hired a trucking company to transport each of the loads. These shipments are referred to as "brokered loads." Different companies were ultimately hired to move the equipment. Lares Trucking was hired to transport the forklift. Truckin By the Wild West, an "over-dimensional freight expert," was

3

hired to transport the boom lift. Both loads were scheduled to be transported on the same day, March 26, 2015, to the same location, Irving, Texas.

Lares Trucking's driver, Valentin Martinez, arrived at the United Rentals office between 8 and 8:30 a.m. on March 26 with a flatbed trailer to transport the equipment. Manuel Montez, the operations manager, greeted Martinez, who spoke in "broken English" and said he was there for a "boom." According to Montez, he asked Martinez for his paperwork, but Martinez did not have any. Montez asked Martinez to contact his supervisor for a bill of lading (BOL) number. A bill of lading is required before the equipment is released and helps the United Rentals staff ensure the correct person is getting the correct equipment. Martinez tried to contact his supervisor but said his "boss" was not available.

Montez called Julie Wolfe Gainor, the region equipment manager in Weatherford, Texas, and told her that a driver was there to pick up a "boom" to take to Irving but did not have a bill of lading number.[2] Although the evidence showed that the term "boom" could apply to multiple pieces of equipment, including the forklift with boom arm that United Rentals was supposed to ship with Martinez, neither Montez nor Gainor sought any clarification. Gainor pulled the bills of lading and found one boom lift, the Genie S-125, leaving the San Antonio location for

_____
[2] Gainor testified that Montez told her the driver gave him a bill of lading number, but that it was not in the system.

4

Irving. She printed the bill of lading for the boom lift and sent it to Montez. Gainor did not ask Montez for the name of the broker or trucking company.

Montez gave equipment associate Nick Watts the number for the boom lift for loading, and Watts loaded it onto Martinez's flatbed trailer. Although Watts was aware this piece of equipment was one of the larger pieces at United Rentals, he had "no clue" as to what constituted an oversized or over-height load for transport on a public highway. After Watts loaded the equipment on the flatbed trailer, he told Montez. Watts did not measure the load, he said, because that was the responsibility of the driver, and he did not see Martinez measure the load.

When Martinez returned to the office, he showed Montez his cell phone with the bill of lading number for the equipment he was supposed to pick up. Montez wrote the number down on the bill of lading sent by Gainor. The number provided by Martinez, 1013808, belonged to the forklift; the number on the bill of lading, 1015572, belonged to the boom lift. Although Montez knew he needed to verify that the bill of lading number corresponded to the correct equipment, he did not notice the numbers did not match. Martinez signed the bill of lading not realizing he had been given the wrong piece of equipment and, although Montez was also supposed to sign per company policy, he did not. Martinez left with the boom lift between 9 and 9:30 a.m. He did not measure the load before leaving, and although some United Rentals branches had an "over-height bar" at the exit to alert a driver

and staff that a load was over height, the San Antonio branch did not. At 14 feet, 7 inches, Martinez's load was over height, meaning it required a permit that would have provided a route for him to safely transport the cargo. If the proper piece of equipment (the forklift) had been loaded, it would have had a height of 12 feet, 10 inches and no permit would have been required.

At 10:45 a.m., the second driver, Bob West, arrived at the branch with a "step-deck" trailer to pick up the boom lift. A step-deck trailer sits roughly two feet lower than a standard flatbed. West showed Montez his bill of lading for the boom lift, but Montez told him he had already sent the equipment out. Montez contacted Gainor to notify her about the second driver, and she realized Martinez picked up the wrong load. Neither she nor any other United Rentals employee notified anyone. Because the forklift was going to the same location, Gainor and Montez decided to give West the forklift load to transport. According to West, based on his training, knowledge, and experience, it was a mistake by United Rentals to load the boom lift onto an ordinary flatbed trailer for transport on an interstate highway.

## 2. The Accident

At about 11:15 a.m., Martinez was driving north on I-35 approaching a construction zone in Salado. There were multiple signs warning that the upcoming under-construction FM 2484 bridge was low and that loads over 13 feet, 6 inches needed to exit prior to the overpass. Martinez, apparently unaware that his load was

14 feet, 7 inches, did not heed those warnings, and his load struck the bridge, which had a height of 14 feet, one-half inch. The bridge beams collapsed across the northbound and southbound lanes of the highway just as Clark Davis, driving south in a pickup truck, reached the bridge.[3] Davis did not have time to react. One of the beams fell on the hood of Davis's truck, just behind the bumper. His vehicle continued to try to move forward due to inertia and the momentum of the vehicle. The engine and entire occupant compartment were displaced rearward and "crushed to a space about a foot and a half in depth." Davis suffered catastrophic injuries and died at the scene. The cause of death was multiple blunt force trauma and mechanical compression.

The Texas Department of Public Safety investigated the crash, which took several months to complete. Sgt. Stephen Bynum was co-leader of the accident investigation/accident reconstruction team and authored the subsequent report. According to the report, Martinez's trailer was loaded with an incorrect load at United Rentals, but the driver failed to measure the load and ensure compliance with height regulations. The report concluded that the crash was caused by "driver error" and identified the following three contributing factors: (1) oversize vehicle or load, (2) driver's lack of attention to the roadway, and (3) the driver, encountering a

---

[3] Other vehicles were involved in the crash, and other people were injured. This lawsuit focuses only on Davis.

construction zone, disregarded warning signs. The report also noted that, had the correct piece of equipment been loaded on Martinez's trailer, the crash would not have occurred.

William Miller, an accident reconstructionist, testified as an expert for appellees. He reviewed the materials and investigated the case. Miller testified in detail as to how the accident occurred and the sequence of events that led to the boom lift being loaded onto Martinez's flatbed trailer.

According to Miller, United Rentals' loading of the wrong piece of equipment was a contributing factor in the crash that killed Davis. As Miller explained, a United Rentals employee drove the boom lift onto Martinez's flatbed trailer. The boom lift created an "oversized load" with a height of over 14 feet, the maximum permissible load to operate on the highway without a permit. Miller explained that when a permit is obtained, the State provides a route to the driver so that he can safely transport his cargo.

In this case, before Martinez ever left the facility, he gave Montez a bill of lading number that identified the forklift, and that unit on a flatbed truck would have been within the legal "height limits" and legal on Texas highways. Miller testified that if Martinez had been given the piece of equipment that he was supposed to have, it would have been under 14 feet and would not have hit the bridge. This did not, however, relieve Martinez of the responsibility to check the height of his load and,

8

if needed, obtain a permit. But Miller testified that under the Texas Administrative Code, both the loader and the driver shared the responsibility to ensure the load complied with height requirements.

### 3. The Defense

United Rentals' defense in this case was that it owed no duty to ensure that its loading of equipment onto Martinez's trailer was done safely and, specifically, was not an over-height load. United Rentals believed an outside hauler, like Martinez, had the sole responsibility for his load, but its witnesses generally agreed that United Rentals had a policy to match a bill of lading to the equipment being released. They also believed that once the load was on the truck and the driver signed the bill of lading, it was solely the driver's responsibility, and several of its witnesses testified to that effect, sometimes to the extreme.

For example, Montez, the operations manager, acknowledged that had he taken the bill of lading number given to him by Martinez and "checked the tray" in the office, he might have found the correct bill of lading. Nevertheless, when asked if he had "made the connection" that the bill of lading number was for the forklift, not the boom lift, would he have made Martinez unload the boom lift, Montez responded: "If he came back and said, my boss said a forklift, we would unload them." And when asked if he believed that releasing the wrong piece of equipment to the wrong truck driver could create a hazard, Montez said, "In any situation it's a

hazard. It's a hazard loading a box of potatoes, not set right. There is [sic] potential hazards every day."

Further, although the branch's general manager, Bill Howell, agreed there is a "safety aspect" to releasing equipment and United Rentals did not want the wrong driver picking up the wrong load, he said he "didn't know for sure" how he would have responded if he knew the number on the bill of lading provided by Martinez did not match the equipment loaded onto his trailer. Howell said he "wasn't there [on the day of the accident] to make the decision" and did not have all the "pieces to the . . . puzzle." And, although he was familiar with different types of trailers, when asked if, in his experience, it would be a mistake to transport an S-125 boom lift on an ordinary flatbed trailer, he said he did not know.

But the regional equipment manager, Gainor, testified had she known Martinez had a flatbed trailer to haul the S-125 boom lift, she would have been concerned "because you can't haul a 125 on a flatbed." And James Delaney, who was in charge of safety at the branch, testified he would expect Watts to be able to discern that the load was "too high." Delaney also testified that United Rentals employees have the responsibility to step in and stop unsafe practices at the branch. Moreover, Louis Womack, who was the region fleet director at the time of the accident, testified it was the driver's responsibility to have the proper trailer to haul the load. But Womack also acknowledged that United Rentals did bear

10

responsibility for failing to verify the bill of lading number against the equipment given. If the equipment was over height, United Rentals' witnesses testified the driver was responsible and could refuse any load. As District Manager Audie Reed stated: "Whatever is on his trailer and he signed for is what we intend for him to leave with. We don't want him leaving with anything other than that. We don't want to change documentation after the fact."

**4. The Verdict**

Davis's mother, Pamela Evans, and his then-minor son, Dominic Jones, brought a wrongful death and survival action, naming as defendants United Rentals, Martinez, Lares Trucking, and several parties associated with constructing the bridge. All the defendants except United Rentals either settled or were dismissed from the suit.

The case proceeded to trial. During voir dire, the trial court granted appellees' *Batson* challenge to United Rentals' use of two peremptory strikes on black women and denied United Rentals' competing *Batson* challenge to appellees' use of their peremptory strikes on men and white panelists. Jurors heard evidence for eight days. At the conclusion of the evidence, the trial court submitted the case to the jury on a negligence issue that listed four potential responsible parties and then conditionally instructed the jury to assign percentages of responsibility, if any. The jury found all four parties negligent and assigned responsibility as follows: James Construction

11

Group, 10%; United Rentals North America, 30%; Lares Trucking/Valentin Martinez, 50%; and HNTB Corporation, 10%. The jury awarded compensatory damages totaling $1.6 million to Davis's son and $2.7 million to his mother. In addition, the jury found Davis suffered pain and mental anguish before his death as a result of the occurrence and awarded $5 million to his estate. No exemplary damages were awarded. The trial court rendered final judgment in accordance with the jury's verdict, awarding appellees 30% of $9.3 million, or $2.79 million, plus pre- and post-judgment interest. United Rentals' post-judgment motions were overruled by operation of law, and this appeal ensued.

NEGLIGENCE

In its first issue, United Rentals challenges the jury's negligence finding, arguing that as a shipper, it did not owe a legal duty to "safely secure, measure, or transport" the Genie S-125 boom lift. Rather, it contends that the carrier, Lares Trucking, and its driver Martinez owed appellees these "non-delegable duties" under state and federal regulations and common law. United Rentals contends that, to obtain a recovery against it, appellees needed to establish an exception to this "general rule," such as negligent undertaking or a negligent control theory, and appellees did neither.

In response, appellees argue that Texas common law imposes on all persons, including shippers, the duty to exercise ordinary care to avoid actively inflicting

12

injury on others, and nothing in the statutes or regulations relied on by United Rentals purports to preempt or replace this common law duty of ordinary care. They argue they properly submitted the case under a general negligence theory and dismiss any attempt by United Rentals to "confine" their claims to negligent undertaking or negligent control.

To establish a negligence action in Texas, a plaintiff must present evidence establishing a legal duty, breach of that duty, and damages proximately caused by the breach. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). "Liability is grounded in the public policy behind the law of negligence which dictates every person is responsible for injuries which are the reasonably foreseeable consequence of his act or omission." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 315 (Tex. 1987). In other words, even in the absence of a specific legally prescribed duty, there exists a general duty applicable to all to exercise reasonable care to avoid foreseeable injury to others. *Id.*; *Zamora v. Kazanoff*, No. 03-07-00315-CV, 2009 WL 3682612, at *2 (Tex. App.—Austin Nov. 6, 2009, no pet.) (mem. op.). Whether a duty arises under a set of facts is a question of law. *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex. 1994). In making this determination we consider the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the

13

injury, and the consequences of placing the burden on the actor. *Id.* The foremost and dominant consideration is foreseeability of the risk. *Poole*, 732 S.W.2d at 311.

United Rentals first argues that, as a shipper, it had no duty to see that the carrier, Lares Trucking, shipped its cargo safely, even if it participated in the loading process. As legal support, it generally relies on provisions of the Texas Transportation Code, the Texas Administrative Code, and two cases, *Gonzalez v. Ramirez,* 463 S.W.3d 499, 506 (Tex. 2015) (per curiam), and *Texas Specialty Trailers, Inc. v. Jackson & Simmen Drilling Co.*, No. 2-07-228-CV, 2009 WL 2462530 (Tex. App.—Fort Worth Aug. 13, 2009, pet. denied) (mem. op.).

We do not disagree that applicable federal safety rules and the Texas Transportation Code impose a statutory duty on carriers regarding the safe transportation of their loads. *See* 49 C.F.R. § 392.2 ("Every commercial motor vehicle must be operated in accordance with the laws, ordinances, and regulations of the jurisdiction in which it is being operated."); 37 TEX. ADMIN. CODE § 4.11 (incorporating by reference 49 C.F.R. § 392); TEX. TRANSP. CODE § 621.207 ("The operator of a vehicle that is higher than 13 feet 6 inches shall ensure that the vehicle will pass through each vertical clearance of a structure in its paths without touching the structure."); TEX. TRANSP. CODE § 621.504 ("A person may not operate or attempt to operate a vehicle over or on a bridge or through an underpass or similar structure unless the height of the vehicle, including load, is less than the vertical

14

clearance of the structure as shown by the records of the department."). We do disagree, however, with the suggestion that these statutes, in conjunction with *Gonzalez* or *Texas Specialty*, relieve a party who breaches a common law duty of care from liability for its own negligence and comparative share of resulting damages in all circumstances.

We begin with *Gonzalez*. There, Cuahutemoc Gonzalez, the owner of Gonzalez Farms, agreed to harvest another farm's silage and haul it to the feed yard. Gonzalez contracted with companies to transport the silage, including one owned by Robert Garcia. *Gonzalez*, 463 S.W.3d at 501. Gonzalez's harvesters loaded each truck and then signaled to the driver when the trailer was full. *Id*. The driver then delivered the load. Raymond Ramirez was one of the drivers that Garcia sent to transport the silage. *Id*. On Ramirez's first trip to the feed yard, a tire on his tandem truck blew out, causing him to lose control and careen into oncoming traffic. *Id*. The truck collided with a vehicle occupied by a mother and her teen-age daughter. All three were killed in the crash. *Id*.

Similar to the case before us, the girl's father brought a direct claim against Gonzalez for negligent overloading. *Id*. Gonzalez, however, obtained a summary judgment on that claim, and the court of appeals affirmed, concluding that even if there was some evidence that Gonzalez undertook a duty not to overload the tandem truck, there was no evidence that he breached that duty. *Ramirez v. Garcia*, 413

15

S.W.3d 134, 139 (Tex. App.—Amarillo 2013), *rev'd on other grounds*, *Gonzalez v. Ramirez,* 463 S.W.3d 499 (Tex. 2015) (per curiam). The plaintiff did not appeal this ruling; thus, the supreme court did not address the negligent overloading claim against Gonzalez, who is the equivalent of United Rentals in this case, or what common law duty a shipper may owe to a third party motorist.

In *Texas Specialty*, Jackson and Simmen (J&S) contracted with Texas Specialty Trailers to transport a drilling rig to another county. Texas Specialty then hired an independent contractor to drive the truck pulling the trailer on which the rig was to be loaded. 2009 WL 2462530, at *1. J&S, Texas Specialty, and the independent contractor all had a hand in loading the rig onto the trailer. While the rig was being transported, the trailer became separated from the vehicle hauling it, and the rig rolled off and was damaged. *Id*. J&S sued Texas Specialty and the independent contractor for, among other things, negligence in loading the rig. Although requested, the trial court did not submit the proportionate responsibility of J&S to the jury. *Id*.

On appeal, J&S argued that even if it had participated in the loading process, it was not a responsible party because, under state and federal statutes, the carrier was "fully liable" for any loss or injury to property unless "the shipper assumes the carrier's responsibility for loading and securing the cargo." *Id*. at *7. The court concluded that the evidence showed that Texas Specialty and the independent

16

contractor retained "full control and responsibility" for loading and securing the rig. *Id*. The court determined that J&S had no duty as a matter of law with regard to loading the rig and the fact it "assisted in loading the rig, without more, [did] not impose on [it] a duty to insure the safe and secure loading of the rig." *Id*. at *8.

The *Texas Specialty* case does not involve the duty owed to unsuspecting motorists when a shipper's conduct creates a danger; rather, it involves the liability between the shipper and carrier when cargo is damaged, sometimes referred to as the "*Savage* rule." *See id*. at *7 & nn.65–67 (citing *United States v. Savage Truck Line, Inc.*, 209 F.2d 442, 445–47 (4th Cir. 1953), and *Mo. Pac. R.R. Co. v. Elmore & Stahl*, 368 S.W.2d 99, 101 (Tex. 1963), *aff'd*, 377 U.S. 134 (1964)). United Rentals does not cite any case applying the *Savage* rule and attendant regulations to negate a defendant's duty owed to third party motorists, such as Davis. *See Bujnoch v. Nat'l Oilwell Varco, L.P.*, 542 S.W.3d 2, 8 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (noting some courts have concluded *Savage* rule would not apply under these circumstances).

The case here is more factually similar to that in *Bujnoch.* In *Bujnoch*, a car slipped off the roadway and overturned after encountering some oil-based mud cuttings that had leaked onto the roadway from an open-load dump trailer. 542 S.W.3d at 4. A passenger in the car was ejected and killed, and her survivors sued both the independent trucking company that operated the trailer and the company

17

that loaded the trailer for negligence. *Id*. The loading company sought summary judgment on the ground that it owed no duty to secure the mud load. Like United Rentals here, it argued that under federal and Texas regulations applicable to commercial motor carriers as well as Texas common law, it is "solely the carrier's duty to secure its load prior to transporting it on public highways." *Id*. at 6.

The court of appeals, however, was unpersuaded. It reasoned that while common law rules regarding a carrier's liability to a shipper, as reflected in *Texas Specialty* and attendant regulations, govern the rights and liabilities among carriers and shippers, those same rules do not govern a case involving personal injury to an innocent party with no connection to the trucking industry. *Id*. The court then analyzed the general law of negligence, noting that the supreme court had recognized that "if a party negligently creates a dangerous situation, the party then has a duty 'to do something about it to prevent injury to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby.'" *Id*. at 9 (quoting *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995)).

The court then went on to consider the law of voluntary undertaking and the evidence submitted before concluding that the shipper, having undertaken the duty to load the mud, was required to use reasonable care in doing so to prevent an unreasonable risk of harm to other motorists who would be affected if the load was

inadequately secured. *Id.* at 10. "[The shipper's] loading of mud into an open-top dump trailer without allegedly securing the load or verifying that the load was secured, and with knowledge that the trailer would traverse Texas highways, posed a foreseeable risk to other motorists." *Id.*

Here, we agree with *Bujnoch* to the extent it concludes that a party, other than the carrier, may owe a duty to third-party motorists for dangerous conditions created by that party and that it could reasonably foresee. Imposing a duty of care on United Rentals in these circumstances does not, and, in fact, did not, absolve the carrier or its driver of responsibility as evidenced by the jury's verdict. Rather, it merely acknowledges that a party who takes affirmative acts that create a danger on a public highway can be held responsible for the results of those actions, along with other responsible actors. And although *Bujnoch* appears to rely on negligent undertaking for this duty, rather than general negligence, nothing in the opinion suggests that general negligence would not apply. In this case, the overwhelming evidence showed that placing a boom lift on a flatbed trailer—thus rendering it over height— could create a risk of foreseeable injury to other motorists on the road. We see nothing burdensome in placing a duty on those who participate in the loading and transportation of equipment to do so in a manner that does not place other motorists in danger. Accordingly, we conclude United Rentals owed a duty of reasonable care to Davis under the facts presented.

Having concluded that United Rentals owed a duty to Davis, we next consider whether there was legally and factually sufficient evidence to show that it breached that duty or proximately caused Davis's fatal injuries.

The jury charge asked a general negligence question and provided the standard definitions of negligence, ordinary care, and proximate cause. It also instructed the jury as follows: "In considering whether United Rentals was negligent, you are instructed that you are to consider only its responsibilities as a shipper, meaning one who consigns the movement of a shipment, and as a loader, meaning one who loads a piece of equipment for transport."

In a legal sufficiency challenge, we view the evidence "in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). The evidence is legally sufficient if "more than a scintilla of evidence exists." *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Litton Loan Servicing, L.P. v. Manning*, 366 S.W.3d 837, 840 (Tex. App.—Dallas 2012, pet. denied). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010). In a factual sufficiency

challenge, we "consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

United Rentals does not make separate arguments regarding legal and factual sufficiency. As to both, United Rentals argues that it acted reasonably with respect to any knowledge and duty it may have owed. Specifically, it argues the evidence shows that (1) Martinez requested a "boom" to take to Irving, (2) the description matched only the Genie S-125, and (3) Martinez signed a bill of lading accepting the Genie S-125 after Watts put the equipment on his trailer. As for proximate cause, United Rentals argues it did "nothing more" than give Martinez the boom lift he asked and signed for and assisted in placing it on his trailer. United Rentals argues that boom lifts, like the Genie S-125, are transported safely "every day by motor carriers and their drivers" and that the accident resulted from Lares Trucking and Martinez failing "to comply with the non-delegable duties imposed upon them to measure the height of the load and select an appropriate route."

To the extent that United Rentals' argument is premised on the notion that it owed no duty in this case, we have concluded otherwise. Moreover, the remainder of United Rentals' argument fails to consider the evidence of its own negligence. In particular, the evidence showed that Martinez asked only for a "boom," not a "boom lift." The forklift that Martinez was supposed to pick up had a boom arm or "part."

21

Nevertheless, based on what the jury could have determined was an "ambiguous" request, United Rentals determined that Martinez was requesting the boom lift and loaded it onto his flatbed trailer, despite the company's own internal Transportation Guide showing the maximum dimensions for a flatbed trailer load. In addition, Bob West, an experienced truck driver, testified that based on his training, knowledge, and experience, it was a mistake for United Rentals to load the boom lift onto an ordinary flatbed trailer for transport on an interstate highway.

Before leaving, Martinez provided the bill of lading number for a forklift to Montez, the operations manager. Montez wrote the number down on the bill of lading for the boom lift. He did not check the number against United Rentals' own records to ensure Martinez had the correct equipment, despite company policy that he do so, and Martinez left with the boom lift. At trial, United Rentals' branch manager, Bill Howell, testified there is a safety aspect to releasing the correct equipment, and United Rentals did not want the wrong driver picking up the wrong equipment. And Fleet Manager Louis Womack admitted that had United Rentals matched the numbers, it could have avoided the risk of an over-height load on the highway, and, having failed to do so, bore responsibility in this case.

Finally, some thirty minutes before the accident occurred, West entered the United Rentals office, asked for the boom lift, and produced a corresponding bill of

lading. At that point, United Rentals knew it had given the wrong piece of equipment to Martinez, but neither Montez nor Gainor notified anyone.

Appellees' expert testified that the bridge strike would not have occurred but for United Rentals' loading the wrong piece of equipment onto Martinez's trailer. Similarly, the Texas Department of Public Safety issued a report in which it noted that the "incorrect piece of equipment was loaded. Had the correct piece of equipment been loaded, the crash would not have occurred."

In sum, United Rentals loaded the wrong equipment based on the assumption that "boom" meant boom lift, failed to check the driver's bill of lading number against the bill of lading for the boom lift, and when it knew the wrong equipment had been released and had time to take corrective action, did nothing. As a result, Martinez's trailer struck the bridge, causing the beam to collapse on Davis's vehicle, killing him. We conclude this evidence is both legally and factually sufficient to support the jury's answer that United Rentals' negligence in this case proximately caused Davis's death. Accordingly, we overrule the first issue.

DAVIS'S CONSCIOUS PAIN AND MENTAL ANGUISH

Question 5 asked jurors what sum of money would fairly and reasonably compensate Davis for his pain and mental anguish. The charge defined pain and mental anguish as "the conscious physical pain and emotional pain, torment, and

23

suffering experienced by Clark Brandon Davis before his death as a result of the occurrence in question." The jury awarded $5 million.

In its fourth issue, United Rentals argues the evidence is legally and factually insufficient as to both the existence of conscious pain and anguish and the amount awarded. We begin with evidence of the existence of pain and anguish.

## 1. Existence of Pain and Mental Anguish

In Texas, only pain consciously suffered and experienced is compensable. *Ruiz v. Guerra*, 293 S.W.3d 706, 722 (Tex. App.—San Antonio 2009, no pet.). Its existence may be established by circumstantial evidence or inferred or presumed as a consequence of severe injuries. *Id*.; *City of Austin v. Selter*, 415 S.W.2d 489, 501 (Tex. App.—Austin 1967, writ ref'd n.r.e.). Direct proof of such suffering is not necessary. But damages for any pain or suffering during the time the injured person is unconscious are not permitted. *Casas v. Paradez*, 267 S.W.3d 170, 185 (Tex. App.—San Antonio 2008, pet. denied). Consciousness of approaching death is a proper element to be considered in evaluating mental suffering. *Ruiz*, 293 S.W.3d at 722.

As stated previously, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 821. Even if evidence is undisputed, it is the province of the jurors to draw from it whatever inferences they wish so long as more than one

inference is possible. *Id*. at 822. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id*. So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the trier of fact. *Id*.

In arguing whether the evidence is sufficient, both sides direct us to the testimony of two witnesses: the accident reconstructionist and the medical examiner.

Miller, the accident reconstructionist, testified about Davis's ability to perceive and react as the bridge was collapsing, which was relevant to whether Davis was aware of his approaching death. Miller testified that Davis did not have time to react to the falling beam. He explained that the beams fell to the ground within nine-tenths of a second, at most, which was not enough time for any of the drivers involved to "react, perceive and react." Given how quickly the bridge beams fell and the fact other vehicles traveling behind Martinez had only a second or so to react, Miller believed Davis did not have time to react, "other than maybe to realize, if he realizes, that beam is falling." Miller was asked whether Davis would have had time to "at least . . . perceive that there was a hazard or there was this terror or there was this oh, my gosh moment." Miller responded that it takes the typical person about a second and a half to begin to react, or apply the brakes, but that "varies from situation to situation or the stimulus of the hazard." He explained that a jet fighter pilot has

25

"very, very quick reaction times of down to about six-tenths of a second. So the answer is, yeah, I think there is time to have that oh, my gosh, what's happening, you know, in a moment."[4]

Dr. Janice Townsend-Parchman, the medical examiner, testified that she performed the autopsy on Davis and determined his cause of death was "blunt force injuries with associated mechanical compression." Townsend-Parchman detailed Davis's injuries, which included massive trauma to his torso. There were lacerations and bruises to his heart, and six of eight "great vessels" were "completely popped off" and the aorta transected. Twenty-two of his twenty-four ribs and his sternum were fractured as was his pelvis and thigh bone. There were lacerations to his lungs, diaphragm, and liver. Davis also suffered multiple abrasions to his face, his jawbone was fractured, and teeth loosened. Although he had a subscalpular hemorrhage or contusion at the top of his head, his skull was not fractured. According to Townsend-Parchman, the injuries were caused by "something mammoth" crushing him and were "way more" than "you see in most traffic wrecks."

On cross-examination, defense counsel asked Townsend-Parchman if she could state, with reasonable medical probability, whether or not Davis "was actually

---

[4] At this point, United Rentals objected that "this" appeared to be outside of Miller's expertise, designation, and report. Appellees responded that it was "standard practice" for a crash reconstructionist to discuss "perception/reaction times." The trial court sustained the objection and instructed counsel to "move on," but United Rentals did not request, and the trial court did not instruct, the jury to disregard any of the testimony before it.

aware of what had happened to him after the accident happened, whether he was consciously aware." Townsend-Parchman prefaced her testimony with, "I'll tell you what I can." She went on to testify that Davis had a subscalpular hemorrhage but no other head injury. She said he "may or may not have been knocked unconscious, and there's no way to know." Townsend-Parchman said that since Davis had "no other real internal head injuries," she had nothing "anatomic" to "pull" her in the direction that he was "knocked unconscious." On the other hand, she continued, there have been people with only a subscalpular hemorrhage who "were knocked unconscious. So that's a maybe. That's a big question mark that's going to stay a question mark." She explained that since the nature and extent of his injuries meant that his heart was no longer pumping blood, "and he's not breathing," Davis had only "the 10 to 15 seconds worth of oxygen that was already in his brain" from the moment his chest was crushed. After that, she said, he "is leaving consciousness and never regaining it." She agreed that it was "speculative" to say whether or not he was actually consciously aware of what happened to him after the accident: "He may have been unconscious, he may have been stunned, so not knocked out exactly, but disoriented, or he could have been clear as a bell for 10 to 15 seconds." But, she added, "[t]here is nothing to distinguish those."

On appeal, United Rentals argues the above evidence constitutes no evidence that Davis "actually knew of the beams falling onto his vehicle" or remained

conscious after it happened. Specifically, it argues (1) that because there is no evidence that Davis reacted by, for example, applying the brakes, the jury was precluded from finding that he consciously perceived the falling of the beam, and (2) there was no evidence Davis was conscious after the beams fell on his vehicle and Townsend-Parchman testified that it would be "speculative" to say whether he was conscious or unconscious.

In response, appellees assert that Townsend-Parchman's testimony that (1) Davis had ten to fifteen seconds of oxygen in his brain and (2) she was "unwilling to state whether or not Davis was knocked unconscious by the impact" but admitted he could have been "clear as a bell," coupled with Miller's testimony that although Davis did not have time to perceive and react, he did have time to have an "oh, my gosh" moment, is sufficient to establish conscious pain. We agree.

Miller's testimony provided some evidence from which a jury could have reasonably inferred that Davis was aware of his impending death before the crash occurred. Miller testified Davis had time to perceive, if not react to, the collapsing bridge beam, specifically opining that he had time for an "oh, my gosh" moment. *See Vogler v. Blackmore*, 352 F.3d 150, 160 (5th Cir. 2003) ("It is not relevant for purposes of the jury's determination of the mere presence of pre-death mental anguish that the awareness lasted, at most, three and a half seconds."). Thus, the

28

fact that Davis did not have time to apply his brakes or make some other show of evasive action is of no moment.

Although Townsend-Parchman testified Davis "may or may not have been knocked unconscious, and there's no way to know," this testimony, placed in context, was that there was no way for her to know from the autopsy, to a reasonable medical probability, whether he *lost consciousness* immediately after the crash, because he was undoubtedly conscious before the crash. Thus, her testimony that she could not say to a reasonable medical probability that Davis was conscious after the crash is not conclusive proof that Davis was unconscious nor did it preclude the jury from drawing whatever reasonable inferences they wished from the evidence, so long as more than one was possible from the evidence. Townsend-Parchman's other testimony provided this evidence.

Townsend-Parchman testified that, at the time of the crash, Davis had ten to fifteen seconds worth of oxygen already in his brain. Unlike the injuries to his torso, Davis did not suffer significant head injuries. His skull was not fractured, and he sustained only the subscalpular hemorrhage to the top of his head. Townsend-Parchman specifically said that because there were no other "real internal head injuries," she had nothing "anatomic" to pull her in the direction that Davis was unconscious. In other words, a jury could infer that, given Davis's specific injuries, the medical evidence did not suggest an injury rendering him from a conscious to

29

unconscious state. Townsend-Parchman told the jury that Davis could have been unconscious, stunned, or "clear as a bell." This evidence allows for more than one inference and, in fact, allowed the jury to infer that he was conscious for up to fifteen seconds after the crash.

No one will ever "know" with certainty whether Davis was aware of his impending death and whether he sat crushed but conscious in his truck suffering the massive injuries to his body. But the lack of direct evidence on this issue does not preclude a jury from reasonably inferring from the evidence presented that Davis was aware of his impending death and consciously suffered the pain of his injuries during those final moments of his life.

In reviewing the evidence, our obligation is to consider "evidence favorable to the finding being challenged if a reasonable fact-finder could and disregard[] evidence contrary to the finding unless a reasonable fact-finder could not." *Sadeghian v. Jaco*, No. 05-18-00838-CV, 2020 WL 400172, at *5 (Tex. App.— Dallas Jan. 23, 2020, pet. filed) (mem. op.) (citing *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 859 (Tex. 2017)). Considering the evidence consistent with this obligation, allowing the reasonable inferences therefrom, and viewing the evidence in the light most favorable to the jury's verdict, we conclude appellees presented some evidence of probative force to support the jury's finding that Davis consciously experienced physical pain and emotional pain, torment and

30

suffering. Although United Rentals' issue states it is also challenging the factual sufficiency of the evidence, it has not made a separate factual sufficiency argument. But, to the extent it relies on the same facts and argument to challenge factual sufficiency, we conclude the jury's finding was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176.

## 2. Amount of Damages

Having concluded there was sufficient evidence of the existence of conscious pain and suffering, we next consider United Rentals' argument that there was no evidence "to justify the amount of survival damages awarded by the jury." United Rentals argues that, to the extent Davis suffered conscious pain and mental anguish prior to his death, that pain and anguish lasted no more than ten to fifteen seconds, and such a short duration, regardless of how extreme, cannot support a $5 million verdict. In its prayer, it asks that the award, if not set aside, be substantially remitted to no more than $400,000 or, in the alternative, a new trial be ordered if remittitur is not accepted.

The process of awarding damages for amorphous, discretionary injuries such as pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, pecuniary loss. *Sanchez v. Balderrama*, 546 S.W.3d 230, 237 (Tex. App.—El Paso 2017, no pet.); *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d

31

230, 248 (Tex. App.—Texarkana 2005, no pet.). The process is not readily susceptible to objective analysis. *Sanchez*, 546 S.W.3d at 237. Because there are no objective guidelines to assess the monetary equivalent of pain and suffering resulting from physical injury, the jury is given a great deal of discretion in awarding an amount of damages it deems appropriate. *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex. 1997); *Sanchez*, 546 S.W.3d at 237; *Casas*, 267 S.W.3d at 185. It is the jury's province to resolve the speculative matters of non-economic damages, such as pain and suffering. *Sanchez*, 546 S.W.3d at 237. As long as there is sufficient probative evidence to support the jury's verdict, this Court will not substitute its judgment for that of the jury. *Id*. And in the absence of a showing that passion, prejudice, or other improper motive influenced the jury, the amount assessed by it will not be set aside as excessive. *Green v. Hale*, 590 S.W.2d 231, 237 (Tex. App.—Tyler 1979, no writ). The mere fact of a large award does not show that the jury was influenced by passion, prejudice, sympathy, or other circumstances not in evidence. *Casas*, 267 S.W.3d at 185. Instead, the award must be flagrantly outrageous, extravagant, and so excessive that it shocks the judicial conscience. *Id*.

Thus, in sum, when reviewing a jury award for pain and suffering, we keep in mind that (1) we should not substitute our judgment for that of the jury, (2) in the absence of an affirmative showing of bias or prejudice, we will give every

intendment to the evidence supporting the verdict, and (3) the judgment of the jury is as good as that of the court and it should prevail unless it appears that the verdict is influenced by passion or prejudice and is not the result of honest convictions. *Green*, 590 S.W.2d at 237.

United Rentals first argues that the amount of damages is not supported by evidence because appellees simply picked the number suggested by appellees' counsel at closing argument and "put it in the blank." At closing, appellees' counsel suggested $10 million to $15 million as the total amount of damages for (1) the past and future loss of companionship and mental anguish of Davis's mother and son and (2) the pain and anguish suffered by Davis prior to his death. Counsel argued, "And you can allocate it however you see fit. Again, this is just a suggestion. You guys have all the control on this." The jury ultimately awarded a total of $9.3 million (of which $5 million was for Davis's conscious pain and suffering), an amount lower than even the lowest end of counsel's suggestion. Consequently, the record does not support United Rentals' claim that the jury simply plugged in counsel's number. If anything, the jury thoughtfully considered the evidence before awarding Davis's estate more than twice as much in damages as it did his family members as compensation for the pain and anguish that Davis experienced.

Next, United Rentals argues that no precedent supports awarding a multi-million dollar verdict for "only a few seconds of conscious pain and suffering." They

ask us to compare the awards in six state and federal cases with the award here to demonstrate that $5 million is too much. Assuming that a "numbers game" or "comparative analysis" of other cases can be a relevant method for determining whether an award is reasonable compensation for pain and suffering,[5] we conclude the cases relied on by United Rentals are either so factually dissimilar or are so remote in time (anywhere from a decade to more than four decades) that the amounts fail to reflect today's economic and societal values. *See U-Haul Int'l, Inc. v. Waldrip*, 322 S.W.3d 821, 855–56 (Tex. App.—Dallas 2010), *aff'd in part, rev'd in part on other grounds*, 380 S.W.3d 118 (Tex. 2012) (explaining that because each case must be measured by own facts and jury has considerable latitude and discretion, "a comparison with other cases or amounts of verdicts is generally of little or no help" when assessing noneconomic damages).

Of the six cases, only one relied on evidence that the decedent consciously suffered pain from the injury. *See Living Ctrs. of Tex., Inc. v. Penalver*, No. 04-09-00320-CV, 2010 WL 1708333, at *5–6 (Tex. App.—San Antonio Apr. 28, 2010, pet. denied) (mem. op.) (estate awarded $300,000 for conscious pain and suffering in case where nursing home patient, who suffered significant blow to head after

---

[5] As Justice Reavley stated when dissenting to his colleagues' suggested remittitur of a woman's pain and suffering damages: "Departing from the rule of deference to jury verdicts, the court lists the awards by different juries and judges, for different parties under different circumstances, adding a percentage for the sake of reasonableness, and thereby fixes the maximum recovery allowable in the case on appeal. This practice has been gently described as a quagmire." *Vogler v. Blackmore*, 352 F.3d 150, 161 (5th Cir. 2003) (Reavley, J., dissenting).

employee dropped her, was conscious and feeling pain for more than two hours before dying). Another case involved the drowning death of an infant more than forty-two years ago. *See Landreth v. Reed*, 570 S.W.2d 486, 492–93 (Tex. App.—Texarkana 1978, no writ) (court affirmed $19,000 awarded to estate for infant's conscious pain and suffering). The remaining cases all relied on pre-crash anguish to support the amount of damages; in none of these cases was there any evidence the decedent was conscious after suffering injuries or what those injuries were. *See Ruiz v. Guerra*, 293 S.W.3d 706, 723 (Tex. App.—San Antonio 2009, no pet.) (noting there was no evidence decedent was conscious after vehicles came to stop); *Lee Lewis Constr., Inc. v. Harrison*, 64 S.W.3d 1, 15–16 (Tex. App.—Amarillo 1999, no pet.) (suggesting $450,000 of $500,000 award to estate be remitted in case where worker fell from ten-story building, screaming as he descended for between 2.7 and 4 seconds, but no evidence that worker was conscious or alive after striking ground); *Mo. Pac. R.R. v. Lane*, 720 S.W.2d 830, 833 (Tex. App.—Texarkana 1986, no writ) (noting that decedent whose truck stalled on tracks and was hit by train was "apparently killed instantly"); *Vogler*, 352 F.3d at 159–60 (decedent aware of impending crash and possible consequences).

Here, we have previously concluded the evidence was sufficient for a jury to reasonably infer that Davis suffered both pre-crash anguish and post-crash physical pain and anguish. Over the course of several days, the jury heard evidence of the

35

horrific details of the crash and the catastrophic injuries suffered by Davis. The evidence established that Davis was traveling at highway speed when the bridge beam suddenly collapsed, landing on Davis's truck just behind the bumper. While Davis had no time to react, he had time to appreciate the possibility, if not the certainty, of his impending death. As momentum tried to push his vehicle forward, the entire engine and occupant compartment were crushed to a space of about eighteen inches in depth. The force of impact caused six of eight vessels attached to his heart to "completely pop[] off," transected his aorta, and resulted in devastating injuries to his other organs, ribs, sternum, pelvis, and thigh. Davis was left with the ten to fifteen seconds of oxygen already in his brain, and the jury could have reasonably inferred that Davis was conscious while he was being crushed. Duration of pain and mental anguish is admittedly an important consideration. *SunBridge*, 160 S.W.3d at 250. But duration is not the only consideration. Fifteen seconds on paper may seem insignificant, but the jury was not considering duration in a vacuum. Rather, it considered ten to fifteen seconds of terror and unmitigated pain and suffering that, based on the evidence, it was free to determine Davis must have experienced during the final moments of his life.

Pain and suffering have no market price, and compensation for them is not capable of being exactly and accurately determined. *Landreth*, 570 S.W.2d at 492. There is no fixed rule or standard for its measurement, and thus the amount must be

left to the sound judgment of the jury, subject only to correction by the courts for abuse and excessiveness. *Id.*

The award is large, but that fact alone does not mandate remittitur or reversal. There is nothing in this record to suggest the jury's verdict was influenced by passion or prejudice or anything other than honest conviction based on the facts of the case. Nor is the award so flagrantly outrageous, extravagant, or excessive that it shocks the judicial conscience. After reviewing the evidence, we conclude the evidence is legally and factually sufficient to support the jury's answers to Question 5. Accordingly, we overrule the fourth issue.

TEXAS ADMINISTRATIVE CODE

In its third issue, United Rentals argues the trial court erred by (1) allowing appellees' accident reconstructionist expert, Miller, to testify about the Texas Administrative Code and (2) refusing to instruct the jury that the Code did not require a shipper, like itself, to comply with vehicle height requirements. We begin with the first subpart.

1. **Miller's testimony on TAC**

Before Miller took the stand, United Rentals advised the trial court it intended to take him on voir dire regarding "some of his opinions" and referred to the Texas Administrative Code. The trial court first questioned why the issue had not been

raised before trial began, but then instructed appellees to take a break before adducing testimony on the subject.

Miller then testified before the jury about his qualifications. He received a B.A. degree in administration of justice from Southern Illinois University and then worked as a police officer in Chicago and one of its suburbs, Northfield, where he was in charge of traffic enforcement and studied both heavy vehicle or commercial motor vehicle carrier enforcement and crash reconstruction. His coursework included investigating, properly documenting, and measuring accident scenes as well as scientific understanding and analyzing of different types of crashes and the dynamics involved. Part of his training in heavy vehicle enforcement included the Illinois Administrative Code.

He left the police department in 2000 to work as a crash reconstructionist with an engineering firm based in Tyler, Texas. There, he reconstructed accidents for civil and criminal litigation, which included documenting scenes, downloading black boxes, and "everything" to obtain the "biggest picture" of an accident. In doing so, he reviewed the Texas Transportation Code, Texas Administrative Code, crash reports, depositions, and various other documents. Three years later, in 2003, he started his own consulting firm doing the same type of work.

Over his career, he has taught classes in crash reconstruction at Northwestern University; traveled throughout the United States teaching engineers, police officers,

and private re-constructionists the foundations of crash reconstruction; and taught courses for Texas A&M University in their engineering extension program in the field of work energy and speed from damage. In addition, he takes 80 hours of continuing education classes every four years to keep abreast of advances in the field. He is accredited by the Accreditation Commission for traffic accident reconstruction and is a member of various organizations that deal with crash reconstruction.

After testifying to his skill, experience, and training, Miller discussed his investigation of this case and the materials he reviewed; how the accident occurred; reaction times; events leading up to the crash, including United Rentals' loading of the wrong equipment onto the flatbed trailer; and the aftermath of the crash.

At that point, the trial court recessed, and United Rentals questioned Miller outside the presence of the jury about his qualifications, knowledge of federal regulations, whether he had ever applied the TAC in court before, and whether he had ever held himself out as an expert in shipping and loading. Miller testified he had applied the TAC in a case in 2016 that involved an oversized load and explained that, as an accident reconstructionist, he deals with over-width, over-height loads.

Although he said he was not a shipping or loading expert as it pertains to a shipper or loader's responsibilities with respect to bills of lading, he said he had done research and dealt with the TAC on overweight and over-height loads and the

39

permitting process. He continued, "That's where the experience and expertise comes from as part of the crash reconstruction, not a shipping or loading expert, anything like that." He testified that as an accident reconstructionist, he looked for the causative factors, and the "over height load was a cause, as well as the aspects of the Administrative Code . . . when we do the research and the knowledge that I had even before this case occurred in the Administrative Code of what are the limitations and who is required to actually have the onus of the responsibility of loading the vehicle and driving the vehicle."

At that point, without asking Miller any specific questions about his opinions with respect to the TAC, United Rentals told the trial court it would "look to review his credibility in front of the jury on other matters." The trial court then noted that United Rentals "appear[ed] to be leaving it as a credibility issue, so there is nothing else to take on voir dire." The court then took a recess and said "we will come back and keep going."

When the proceedings resumed on the record, United Rentals then stated it wanted to raise "one more objection" about the Texas Administrative Code: "We believe that's a legal statute that the Judge should make a ruling on as opposed to talk about a witness and essentially usurping so we would object to the testimony on that." The trial court overruled the objection.

The record shows that once the jury returned to the courtroom, appellees questioned Miller for seven pages about the TAC and its role in his opinions in this case. As part of his research in applying the TAC to this case, Miller said he looked at the permitting process, what is required for a permit, who is responsible for obtaining a permit, and who is responsible for loading and measuring the load. He testified that a provision of the TAC placed the responsibility on both loaders and drivers to comply with state law regarding oversized loads.[6] In this case, he said, the evidence showed that a United Rentals employee loaded the boom lift onto the driver's trailer. United Rentals subsequently cross-examined Miller on the issue to make the point that under the Texas Transportation Code, only the operator of a motor vehicle is responsible for the load's height. It also adduced testimony from Miller that it was the duty of the driver or owner, i.e., Martinez or Lares Trucking, to obtain a permit.

---

[6] In particular, Miller relied on the following provision:

**Cont'd**

(a) A person operating or loading a vehicle for which a permit under this chapter is required shall comply with all applicable terms, conditions, and requirements of the permit, and with this chapter and Transportation Code, Chapters 621, 622, or 623 as applicable.

(b) A person loading a vehicle or operating on a public road or highway a vehicle for which a permit under this chapter is not required shall comply with overweight and size provisions of Transportation Code, Chapters 621, 622, or 623.

43 TEX. ADMIN. CODE ANN. § 219.81.

On appeal, United Rentals argues Miller's testimony about the TAC should have never reached the jury because (1) he was not qualified to offer any opinion on the TAC and (2) irrespective of his qualifications, Miller should not have been allowed to opine on the subject because proper interpretation of the TAC was a question of law for the court.

With respect to the first argument, United Rentals did not raise an objection to Miller's qualifications as an expert; consequently, the first complaint is waived. *See* TEX. R. APP. P. 33.1; *Hilsher v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 717 S.W.2d 435, 441 (Tex. App.—Houston [14th Dist.] 1986, no writ). With respect to the second complaint, we consider whether the trial court abused its discretion in allowing Miller, as an expert, to testify about the TAC's application to the facts of the case here.

We begin with the observation that United Rentals devoted a mere three sentences to the legal argument of this particular issue, providing general citations for the general legal principle that interpretation of the TAC presented a question of law for the trial court. United Rentals engaged in no pertinent legal analysis. Texas Rule of Appellate Procedure requires an appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and the record." TEX. R. APP. P. 38.1(i). Given the cursory briefing, we question

42

whether this issue is adequately briefed. Regardless, United Rentals has not shown error.

We review rulings on the admissibility of expert testimony for an abuse of discretion. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241– 42 (Tex. 1985). Expert testimony is admissible if it will assist the trier of fact to understand the evidence or to determine a fact in issue. TEX. R. EVID. 702.

Generally, a witness may not give legal conclusions or interpret the law for the jury. *Crum & Forster, Inc. v. Monsanto Co.*, 887 S.W.2d 103, 134–35 (Tex. App.—Texarkana 1994, no pet.), *jdgm't vacated pursuant to settlement*, No. 06-92- 00100-CV, 1995 WL 273592 (Tex. App.—Texarkana Mar. 9, 1995). But, an expert may offer his or her opinion as to a mixed question of law and fact, so long as that opinion is based on proper legal concepts. *Id*. An opinion or issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard. *Id*. Thus, to the extent that a witness discusses both the law and its application in the factual context of the case on trial, the testimony involves a mixed question of law and fact. *Id*. The classic example of a mixed question of law and fact is whether actions constitute negligence. *See Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361,

43

365 (Tex. 1987); *Holden v. Weidenfeller*, 929 S.W.2d 124, 133 (Tex. App.—San Antonio 1996, writ denied).

In our system, the trial judge does not generally instruct the jury as to the law of the case until all the evidence is in, but in a case with complex factual and legal issues, it may be difficult for the jury to understand the ramifications of the evidence without guidance while it is being introduced. *Crum & Forster*, 887 S.W.2d at 134–35. Any legal explanation by the judge during the introduction of the evidence might be construed as an impermissible comment on the weight of the evidence, and judges are not generally prepared at that point in the trial to give such instructions. *Id.*

Here, Miller discussed both the law and its application in the factual context of the case on trial; thus, his testimony involved a mixed question of law and fact. *See Lyondell Petrochemical Co. v. Fluor Daniel, Inc.*, 888 S.W.2d 547, 554 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (concluding industrial safety expert was authorized to give opinion as to whether defendant's training program violated specific OSHA regulations); *Crum & Forster*, 887 S.W.2d at 135 (concluding expert's testimony (1) giving opinion that Crum & Forster's conduct was improper and against public policy of State of Texas and (2) explaining legal meaning of Mary Carter agreement was admissible as mixed question of law and fact). Most of his testimony addressed the accident itself and how it occurred. He also acknowledged that Martinez was responsible for measuring his load before he left, regardless of

44

whether there was a mistake in what was loaded. But, he clearly testified that the TAC placed a duty on United Rentals, as the loader, to comply with height requirements. At no point before Miller gave this testimony did United Rentals object that Miller's testimony on this point was incorrect, nor did United Rentals raise any objections about the correctness of any of Miller's opinions on the TAC during his testimony. Its sole complaint expressed to the trial court was whether Miller could testify at all regarding his opinions on the TAC. In keeping with its representation to the trial court that it would "review" or test Miller's credibility before the jury "on other matters," United Rentals subjected Miller to extensive cross-examination, exploring all aspects of his testimony, including his opinion on the causes of the crash, his knowledge of the TAC and its application in this case, as well as the Texas Transportation Code. Miller acknowledged that the relevant sections of the Transportation Code placed duties on operators and/or owners generally, not shippers or loaders. In sum, we conclude Miller's testimony was admissible as addressing a mixed question of law and fact, and the trial court did not abuse its discretion in overruling United Rentals' sole objection.

## 2. Jury Instruction

Having concluded that the trial court did not err in allowing Miller to testify regarding his opinions on the TAC, we likewise conclude it did not abuse its

45

considerable discretion in refusing to give the following jury instruction requested by United Rentals:

> You are instructed that the Texas Administrative Code does not require United Rentals, as a loader, to comply or ensure compliance with any vehicle height requirements in the Texas Transportation Code.

We review a trial court's decision to refuse a particular instruction under an abuse of discretion standard. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). The trial court has considerable discretion to determine proper jury instructions, and "[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *Id*. (quoting *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998)). A valid instruction assists the jury, accurately states the law, and finds support in the pleadings and evidence. *Id*.

The first time United Rentals argued to the court that Miller's substantive opinion on the TAC was incorrect was when it filed a trial brief, two weeks into the trial and long after Miller had testified, presumably to obtain the above instruction. But, as set out above, United Rentals did not question Miller about any of his specific opinions during voir dire, did not object to any specific opinion after voir dire and before Miller testified, and did not object to any of his opinions during his testimony.

46

Given these circumstances, and the fact that the evidence before the jury was contrary to the instruction, we cannot conclude the trial court abused its discretion in denying the instruction. We overrule the third issue.

JURY SELECTION

In its second issue, United Rentals challenges the trial court's *Batson* rulings. It argues the trial court erred in granting appellees' challenges to two of United Rentals' peremptory strikes of black women while denying United Rentals' challenges to appellees' use of its strikes on men, four of whom were white.

## 1. *Batson* hearing

After all strikes for cause and by agreement, the racial makeup of panelists within the strike zone was seven African-Americans, nine whites, nine Hispanics, and one Asian-American. Of these twenty-six prospective jurors, twelve were men and fourteen were women.[7]

Appellees had five strikes and exercised all of them on men, four of whom were white. United Rentals and the other defendants collectively had nine strikes

---

[7] Throughout its brief, United Rentals asserts that the strike zone encompassed twenty-seven potential jurors. This is a miscalculation first made by the trial judge, who erroneously determined the zone based on fifteen total peremptory strikes, instead of the actual fourteen, plus twelve jurors. The miscalculation was carried through the *Batson* hearing and ultimately into the briefing on appeal. For purposes of this opinion, we will use the correct strike zone of twenty six. Additionally, although United Rentals asserts there were eight white jurors in the strike zone, the record (as well as a document it attached as an exhibit to the brief) shows there were nine, and United Rentals struck four. Ultimately, the final jury was comprised of four black women, two Hispanic women, one Asian-Pacific Islander woman, and four Hispanic men. The two alternates were a black woman and a white woman.

and exercised them as a group. United Rentals used five strikes on black women—Juror Nos. 6, 7, 9, 14, and 34, the last of whom was outside the strike zone but within the range for alternate jurors. Appellees raised a *Batson* challenge, arguing racial discrimination in the strikes. The trial court asked United Rentals for a response, and United Rentals explained why it struck each of the five potential jurors. Appellees agreed that United Rentals provided a race-neutral reason as to Juror No. 34, but pressed the challenge as to the remaining four.

At that point, the judge expressed her interest in seeing the defendants' jury notes to determine pretext. She directed the defendants to provide their juror notes and charts to the court reporter, who would make a copy and return them. Then, the judge said, she would research the issue over the lunch break and would not look at those documents until she made a decision.

In response, United Rentals' counsel said that if the court were going to take such a step, it was "making a similar Batson [c]hallenge with respect to the plaintiffs because every single juror they struck was a male," four of whom were white. Counsel continued: "So Batson protects gender as well. So if we're going to turn over our notes, they need to turn over their notes to determine if there is anything with respect to gender in this as well. All of this is ridiculous but if we're doing it, might as well have both sides do it."

The trial court responded that it sounded as if counsel was being "retaliatory in the way you phrase it." Counsel explained that he took offense to a claim of "pretext" or "racism," believed there was not "a basis to argue" that "we were pretextual," and said he wanted "at least the option, given their strikes, to make the same." The judge then asked which potential jurors were being challenged. United Rentals responded it was challenging all of appellees' five strikes—Juror Nos. 1, 8, 19, 24, and 28—on the basis of race and gender discrimination. Thereafter, appellees gave their reasons for striking each of the jurors. Both sides provided their notes to the court reporter, and the trial judge took a break.

When proceedings resumed, the trial judge did not look at or consider the juror notes or charts and directed each side to present evidence of pretext. After each side offered rebuttal to the race-neutral reasons given for striking the prospective jurors, the trial court (1) granted two of appellees' four *Batson* challenges, Juror No. 9 and Juror No. 14, and ordered both jurors seated on the panel, and (2) overruled all of United Rentals' *Batson* challenges. The trial court stated that United Rentals' strikes, while not based on "deliberate prejudice" against African-Americans, were a "deliberate effort" to remove African-Americans from the panel and declined to award any additional strikes. United Rentals and the other defendants then offered to accept and waive any issue as to Juror No. 14 if the trial court would reconsider its ruling as to Juror No. 9. The trial court asked appellees if they were willing to

49

waive objections to Juror No. 9, and they refused. The trial court then denied the motion to reconsider. Juror No. 9 ultimately did not join the jury's verdict; Juror No. 14 did.

## 2. Applicable Law

In *Batson v. Kentucky*, the United States Supreme Court held that a criminal defendant is denied equal protection under the United States Constitution if a prosecutor uses peremptory challenges to exclude members of the jury solely on the basis that their race is the same as the defendant's. *See Batson*, 476 U.S. at 89; *Goode v. Shoukfeh*, 943 S.W.2d 441, 444 (Tex. 1997). Its holding has since been applied to civil trials. *Goode*, 943 S.W.2d at 444–45 (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 618–28 (1991)). And *Batson* has also been extended to other areas, such as gender discrimination and jurors of a different race from the defendant. *Id*. at 445 (citing *J.E.B. v. Alabama*, 511 U.S. 127, 130–31 (1994)) (gender discrimination); *Powers v. Ohio*, 499 U.S. 400, 406–09 (1991) (different race).[8]

*Batson* entails a three-step analysis. At the first step, the opponent of the peremptory strike bears the initial burden of making out a prima facie case of

[8] In an alternative ruling, this Court determined that *Batson* applies to the exclusion of white venire members. *See Price v. Short*, 931 S.W.2d 677, 683 (Tex. App.—Dallas 1996, no writ) ("When relevant circumstances raise an inference of a race-based exclusion of a white veniremember, we conclude that the exclusion would "undermine public confidence in the fairness of our system of justice" the same as the race-based exclusion of a black veniremember."). Here, appellants have not argued below or on appeal that *Batson* does not apply to white venire members.

discrimination, here, either racial or gender. *See Goode*, 943 S.W.2d at 445. A party establishes a prima facie case by presenting facts, as well as other relevant circumstances, that raise an inference that the peremptory strike was used to exclude a venire member on the basis of race or gender. *See Batson*, 476 U.S. at 96; *see also Price*, 931 S.W.2d at 680.

Once a prima facie case is established, the burden of production shifts to the proponent of the strike to come forward with a race- or gender-neutral reason for the strike. *See Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam). An explanation is race or gender neutral if it is based on something other than a juror's race or gender. *See also Goode*, 943 S.W.2d at 445. The explanation need not be otherwise persuasive or plausible. *See Purkett*, 514 U.S. at 767–68; *Goode*, 943 S.W.2d at 445. Unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral for purposes of the analysis at step two. *Goode*, 943 S.W.3d at 445.

It is at the third step of the process that the persuasiveness of the justification becomes relevant. *Goode*, 943 S.W.2d at 445. At this step, the trial court determines if the party challenging the strike has proven purposeful discrimination, and the trial court may believe or not believe the explanation offered by the party who exercised the peremptory challenge. *Id*. at 445–46. "It is at this stage that implausible justifications for striking potential jurors 'may (and probably will) be found (by the

51

trial court) to be pretexts for purposeful discrimination.'" *Id*. at 446 (quoting *Purkett*, 514 U.S. at 768).

As part of this step, the party challenging the strike must be afforded the opportunity to rebut the explanation for the strike. *See Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 514–15 (Tex. 2008). The credibility of the other party's reasons for disparate striking of potential jurors can be measured by "the [other party's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *See Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("*Miller-El 1*"). Whether the race-neutral explanation should be *believed* is purely a question of fact for the trial court. *Goode*, 943 S.W.2d at 446. But, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *Id*. If the trial court determines the strike was racially motivated, it may in its discretion, place the wrongfully struck venire member on the jury panel. *See Price*, 931 S.W.2d at 680–81.

We review a trial court's *Batson* ruling for abuse of discretion. *Davis*, 268 S.W.3d at 515; *Goode*, 943 S.W.2d at 446. Under that standard we reverse a trial court's decision only if it is arbitrary or unreasonable or made without reference to any guiding rules or principles. *Goode*, 943 S.W.2d at 446. With this standard in mind, we turn to United Rentals' contentions.

### 3. United Rentals' peremptory strikes

United Rentals asserts its reasons for its strikes against Juror No. 9 and Juror No. 14 had nothing to do with the potential jurors' race. To the extent United Rentals argues appellees failed to make a threshold showing of discrimination, that issue is moot. Once a party has offered a race-neutral explanation for the strikes and the trial court rules on the ultimate question of intentional discrimination, the preliminary issue of whether the challenging party made a prima facie case becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359 (1991); *Goode*, 943 S.W.2d at 445. Accordingly, we move on to the second and third steps.

United Rentals' explanation for Juror No. 9 was that she "was very responsive to plaintiffs in opening with a lot of head nodding, a lot of openness," and when voir dire switched to the defense, "she crossed her arms, she went back and wouldn't look anyone in the face. So we had concerns just about her openness to our case."

When appellees challenged that reason as pretextual, United Rentals counsel responded:

> And so, again, I want to go back to first the standard and that it's solely based on racial motivations. If we have other factors, body language, and I don't know if you saw juror No. 9 or not, and I will tell you that I was the one in our group that raised up the question with her, because I did see it. I was there, I saw how she reacted to plaintiff's counsel. She nodded the entire time. She was agreeing with him, and when it came to (counsel for another defendant) and myself, we have notes that say she crossed her arms, she wouldn't look at us. She has a - - not the curled lip like No. 12, but essentially the frowned face that was not it. When it comes to - - she's on the front row and I saw her for a day-and-

a-half like that, I guess maybe I can't - - I don't know if these other people have other things, but that was a big part of it. She reacted poorly to us. I don't call it a bad feeling, as they would say in the Court of Appeals. I would say I have a very good read on what this person thinks about me and what they think about [defense counsel for another defendant] and what they think about [plaintiffs' counsel], and that juror was not going to be on my side.

Initially, we note that, contrary to counsel's argument, the standard under *Batson* is not whether the challenged strike was based solely on race; rather, it is whether race was a motivating factor in counsel's exercise of the strike. *See Powers v. Palacios*, 813 S.W.2d 489, 491 (Tex. 1991) (per curiam) ("We hold that equal protection is denied when race is a factor in counsel's exercise of a peremptory challenge to a prospective juror.").

The only questioning of Juror No. 9, located by this Court, began with United Rentals' counsel noting that she "was in the seat of honor . . . right in front of us," followed by this colloquy:

[United Rentals]: Have you ever been through voir dire before?

[Juror No. 9]: I'm sorry?

[United Rentals]: Have you even been through voir dire, like on a jury panel before?

[Juror No. 9]: No.

[United Rentals]: No, okay.

[Juror No. 9]: No. Seen it on TV, but never.

[United Rentals]: Now you get to - - soaking it all in?

[Juror No. 9]: Yes, I am.

54

[United Rentals]:  Do you have an opinion one way or the other about this case?

[Juror No. 9]:  Not really.  I just want to see evidence before I have any type of opinion.  I've just been putting it in, but just kind of - - you know, put a stop to that, and I'm more of an evidence base.  I watch a lot of horror shows, I see a lot of things but at the end of the day I really feel like it doesn't matter to - - it matters if evidence is - - could go each way.

[United Rentals]:  Have you ever been in a lawsuit, either as a plaintiff or a defendant before?

[Juror No. 9]:  Well, a divorce case - -

[United Rentals]:  Okay.

Peremptory strikes may legitimately be based on nonverbal conduct, but nonverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike.  *Davis*, 268 S.W.3d at 518.  For that reason, trial courts must carefully examine such rationales.  *Id*.  As the *Davis* court acknowledged, the court of criminal appeals, with a "much more developed *Batson* jurisprudence," has held that a prosecutor's statement that he didn't like a venireman's "attitude, his demeanor" were pretextual when his verbal answers failed to show hostility, and the prosecutor "never mentioned any specific body language, or any other non-verbal actions which led him to believe the venireman was biased against his case."  *Id*. (citing *Hill v. State,* 827 S.W.2d 860, 869–70 (Tex. Crim. App. 1992)).

55

Here, none of Juror No. 9's nonverbal conduct appears on the record except as described by the counsel for one of the defendants. United Rentals did not question Juror No. 9 about her supposed lack of "openness" to the defense, and her answers to defense counsel's questions were not apparently "hostile." Moreover, by sustaining the *Batson* challenge, we can infer the trial court rejected the nonverbal conduct explanation. Based on our review of the record, we have no reason to conclude the trial court exceeded its discretion to disbelieve United Rentals' explanation for its strike as pretextual. *See id.* at 519 (noting party's failure to question prospective juror about his "purported reaction also suggests that [the juror's] reaction had little do with [the party's] strike"); *see also Mariner Health Care of Nashville v. Robins*, 321 S.W.3d 193, 203–04 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (finding no abuse of discretion in sustaining *Batson* challenge after proponent of strike argued juror made "good eye contact" with plaintiff's counsel but had "poor eye contact" with defense); *Haynes v. Union Pac. R.R. Co.*, 395 S.W.3d 192, 201 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (rejecting nonverbal conduct—a "pleasant smile" to opposing counsel—as racially neutral reason because trial court did not "specifically credit it").

As for Juror No. 14, United Rentals provided two explanations: (1) she previously filed an EEOC complaint and (2) she was foreperson in a murder case. Although seated on the jury, Juror No. 14 did not join the jury's verdict. We may

not reverse a judgment unless we conclude that the trial court's error "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1. Because this juror apparently sided with United Rentals, or believed that appellees did not prove their case, United Rentals cannot show that any error of the trial court affected the judgment. Thus, error, if any, was harmless. *See Mariner Health Care,* 321 S.W.3d at 204; TEX. R. APP. P. 44.1.

As noted earlier, counsel explained to the trial court that he took offense to a claim of "pretext" or "racism." Although we have concluded the trial court did not commit reversible error in its *Batson* rulings, this determination is not intended to suggest that we ascribe sinister motives to the attorneys responsible for the challenged peremptory strikes or have reason to doubt they were "pure of heart." *See Davis*, 268 S.W.3d at 526. As the supreme court explained, the question is not whether a particular advocate "harbors ill will," but whether the record explains on neutral grounds the exclusion of a particular juror under *Batson*. *Id*. A lawyer's failure to adequately justify the strike "does not suggest personal racial animosity on his part." *Id*. We overrule this portion of the second issue and turn to United Rentals' complaints about appellees' strikes.

**4. United Rentals' objections to appellees' strikes**

57

United Rentals next argues the trial court "compounded its *Batson* error" by denying its cross-challenge to appellees' use of all its strikes on men (gender), four of whom were white (racial). It argues appellees' counsel's own statements leave "no doubt" that race and gender "tainted their strikes."

## A. Statements made by appellees' counsel

First, United Rentals directs us to the following statement made by appellees' counsel: "We know from our focus groups that the African-American female is the most favorable juror for this case for whatever reason." United Rentals contends this "view" shows that "the white male was obviously the jury 'they didn't want.'"

It is important to place this statement in the context in which it was made. Earlier, while challenging one of United Rentals' strikes against black women, appellees explained there was a non-black female who presented the exact circumstances as the panelist but whom United Rentals did not strike. In rebutting the explanation offered by United Rentals, appellees made the statement quoted above. Having considered it in the context it was given, we cannot agree that it evidences appellees' intent to seat a jury without whites or males; rather, appellees were explaining why they believed United Rentals' strike of the particular black panelist was pretextual.

Next, United Rentals argues that appellees' counsel's "demeanor" also provided evidence of "purposeful discrimination," relying on *Harris v. State*, No.

AP-76810, 2014 WL 2155395, at *9 (Tex. Crim. App. May 21, 2014) (not designated for publication) (citing *Hernandez*, 500 U.S. at 356). Specifically, United Rentals relies on comments made by appellees' counsel during voir dire regarding the driver of the truck that struck the bridge:

> In this case, if the driver of the truck doesn't speak English, we have no - - we know he's got a driver's license but we have no idea if he's even in this country legally or not. Some people would say, look, given the kind of state of political issues right now, I start off and I say if someone's in the country and we don't even know if they're supposed to be here, no matter what the evidence in the case, no matter who does constructions [sic], I'm going to hold that potentially illegal alien responsible and I couldn't ever hold anyone else responsible. Anyone feel like that on the first two rows?

At that point, the trial court intervened and instructed the venire members that there would be no evidence presented as to "whether or not anybody is or is not . . . in the country illegally, improperly, whatever," although they could "presume it from facts" they heard. Appellees' counsel continued:

> Anyone start off and they say, look, just knowing that someone that doesn't speak much English, and we don't know one way or another, I start off and I say, I hold him responsible, and I probably couldn't hold anyone else responsible. Anyone feel like that on the first two rows?

After an objection by one of the defendants that it was an "incomplete question" and an instruction to "rephrase," appellees' counsel moved on, saying he thought he was "just going to get in trouble."

Later, during a discussion about whether the judge would allow individual questioning of certain jurors, the judge chastised appellees' trial counsel regarding

59

his questions "about illegal aliens and about [the Fifth Amendment]," saying they "put a lot of extraneous prejudicial information in front of the jury that I think caused a lot of problems."

We fail to see how this exchange informs our decision as to whether appellees struck jurors on the basis they were white or male. Regardless of the appropriateness of the exchange, it clearly was intended to identify jurors who might be biased against a non-English speaking defendant who had invoked his Fifth Amendment right not to testify. And, as our courts have recognized, the evaluation of counsel's "demeanor and credibility" lies "peculiarly within a trial judge's province." *Hernandez,* 500 U.S. at 365; *Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010). Here, although the trial judge chastised counsel for his remarks later in the proceedings, she did not indicate she believed his comments reflected purposeful discrimination against any group.

## B. Statistical Disparity

United Rentals next argues statistical data to support its claim of gender and racial discrimination. We acknowledge from the outset that appellees used all of their strikes to eliminate men from the jury, including 80% against white men, statistics that are troubling in isolation. Of the twenty-six panel members in the strike zone, nine were white (three women and six men), or 35%. Appellees struck four, or 44%. Twelve of the potential jurors were men, and appellees struck five, or

60

42%. The jury seated contained no whites—males or females—but did include five men, all Hispanic.[9] To the extent these disparities suggest something more than happenstance, such a disproportionate use merely supports United Rentals' ultimate burden of persuasion. *See McKenna v. W & W Servs., Inc.*, 301 S.W.3d 336, 344 (Tex. App.—Tyler 2009, pet. denied). They do not alone, however, establish that appellees' explanations of the strikes were pretextual. Rather, we turn to a comparative analysis.

## C. Comparative Analysis

### Juror No. 1

Appellees' stated reasons for striking Juror No. 1, an Hispanic male, were that (1) he was chief legal officer/general counsel for a company in the insurance industry and (2) on the third day of jury selection as the court and attorneys were discussing which jurors to question for cause, he came into court and warned that he would judge the case by the evidence but "would hold it against the lawyers if he felt like the lawyers behaved badly." Both reasons are facially race-neutral.

Below, when the court asked for rebuttal on Juror No. 1, United Rentals said it was "not as concerned with" him other than in the overall context that appellees used their strikes on male jurors, adding that "we do understand that there is some reason to do this." Given this statement, we question whether United Rentals has

---

[9] United Rentals struck two of the three eligible white females, and two of the six eligible white males.

waived any particular complaint with this prospective juror. Regardless, on appeal, United Rentals argues that a black female, Juror No. 11, worked for a health insurance company reprocessing and handling escalated insurance claims, yet she was seated on the jury. But, Juror No. 11 was not an attorney who managed litigation and insurance claims, like Juror No. 1, nor did she indicate that she would judge lawyers on how they behaved. In fact, Juror No. 1 specifically asked to be brought back into the courtroom so he could let the trial court know that it "weighed on" him the night before, explaining that if he sensed that a lawyer was "overreaching or being uncivil," he would interpret that as "pounding the table and trying to cover up a weakness in the case, and that would be my bias." Given that no other juror expressed any sentiment remotely similar to this, we cannot conclude that United Rentals has shown that appellees failed to object to a similar juror.

**Juror No. 8**

Appellees said they struck Juror No. 8 because (1) he previously worked for the Texas Department of Transportation and the case involved allegations as to whether TxDOT approved the change allowing the bridge to be erected before lowering the highway lanes and (2) he made comments that "accidents happen" and

that he thought "there are parties of this that are probably not responsible."[10]  Again, both reasons are facially neutral.

As to the first explanation, United Rentals argues eight other panel members "had interactions" with TxDOT, including two female prospective jurors.  But the record does not show that any of these prospective jurors worked for TxDOT; rather, they generally indicated a connection to the trucking industry.  As for the two female prospective jurors, specifically, one said she worked in selling fleets and the other said she worked for a trucking company but was not involved in loading.

As to the second explanation, United Rentals has wholly ignored the juror's statement indicating he might have decided part of the case without hearing any evidence.  Rather, United Rentals argues there were other female prospective jurors who indicated they would need more information before deciding the case.  (One was seated as a juror and the other served as an alternate.)  Needing information to decide the case is markedly different than potentially pre-determining that some parties were not liable.

---

[10] Specifically, the prospective juror responded to a question asking whether he could hold someone responsible for a death if all that is proved is "they should have known," rather than actual knowledge, that someone could get hurt:

> I think just based on what was said yesterday, I would want to hear all the evidence, because I think there are parties of this that are probably not responsible . . . and even they, like I said, accidents, even at construction sites happen.  Even if they knew that there was a possibility of an accident, they may have had no responsibility or - - or guilt in that - - in that happening.

63

**Juror No. 19**

Appellees struck Juror No. 19 because he stated he was hit by a semi-truck and he sued. Appellees feared he would place all blame on a non-trial defendant, the truck driver, and were further concerned that because he received only $400,000 that he could not consider the "tens of millions of dollars" in damages here. Additionally, they said the juror said he strongly agreed that most people who filed personal injury suits are looking for money they do not deserve.

On appeal, United Rentals identified five prospective jurors who also had an "accident history." The first, a black woman who was seated on the jury, said she was involved in a "car accident," and sued other parties and settled the case at mediation. Nothing in the record, however, indicated the collision involved a semi-truck, like Juror No. 19. The second identified juror, a black woman seated on the jury, stated she was hit by a truck driver, but did not believe he saw her because her car was "small." The record also shows, however, there was no injury and no lawsuit. The third juror identified, an Hispanic woman seated on the jury, was a passenger in a car that was hit from behind, was injured, and settled the lawsuit. Again, there was nothing to indicate it involved a truck. The fourth identified juror, an Hispanic man seated on the jury, said he was "rear ended by 18-wheeler from behind while stopped on freeway."[11] Again, however, the record shows there was no

---

[11] United Rentals identified the jury by the wrong name, but this error has no impact on our analysis.

injury and no lawsuit. Finally, United Rentals identified the fifth juror as someone who had been hit by a vehicle, suffered knee and back injuries, filed a lawsuit, and won. But, the record shows that the juror actually identified the person as her mother, and there is nothing to indicate it was a car–truck accident.

Each of these jurors could be distinguished from Juror No. 19 because their circumstances (1) did not involve a truck, (2) did not involve the prospective juror, only a family member, or (3) did not involve injury or lawsuit. Peremptory strikes are often used against jurors whose personal experiences might cause them to identify with an opposing party, and appellees' explanation was specifically focused on the semi-truck driver and their concern the juror would place blame on him.

As for the second explanation, appellees' counsel asked the panel the following:

> Most people who filed personal injury lawsuits are trying to get money they don't deserve. Who strongly agrees with that? There should be limits to the amount of money that someone can recover in a personal injury lawsuit. Who strongly agrees with that? Number 2, No. 5, No. 15, 16, 18, 19, 21, 12, 24, 44, 46, 47, 48, 50, 51, 56, and 69.

United Rentals notes that Juror No. 19 did not say he "strongly agreed" that most people who file personal injury lawsuits are looking for money "they don't deserve": rather, along with sixteen other jurors, he raised his hand in agreement with the statement that "there should be limits to the amount of money that someone can recover in a personal injury lawsuit." Moreover, United Rentals asserts that an

Hispanic juror, No. 18, who was not struck by plaintiffs and was seated on the jury, was among these sixteen other jurors.[12]

Appellees assert the record is not clear as to whether Juror No. 19 answered the first question, the second question, or both; thus, they claim the record is ambiguous. Whether factually accurate or not, pretext is not shown merely because an explanation is factually incorrect. *See Greer v. State*, 310 S.W.3d 11, 16 (Tex. App.—Dallas 2009, no pet.). While Juror No. 18 also raised her hand as to the same sentiment, *Batson* does not require a party to mechanically strike every single venire member who possesses a characteristic that might draw a peremptory strike. *Id*. Disparate treatment is not shown where a party strikes a juror because of multiple characteristics and does not strike jurors of other races or genders who share one or more of those characteristics. *See Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992); *Greer*, 310 S.W.3d at 16. Here, appellees also expressed concern that Juror No. 19 might not be amenable to the damage award they were seeking, given that he had recovered less than what appellees were seeking in this case. And none of the five jurors above or Juror No. 18 expressed this sentiment.

**Juror No. 24**

Appellees gave three reasons for peremptorily striking Juror No. 24: (1) he initially said he would need a higher burden but then "walked back from that" under

---

[12] United Rentals identified the juror as a man, but the record shows she is a woman.

individual questioning, (2) his wife was hit by a trucker and, as with Juror No. 19, they were concerned he would assign all blame to the trucker who was a non-trial defendant here, and (3) that he would assume the truck driver was hiding something because he took the Fifth Amendment. (We note that appellees also challenged this juror for cause.)

As to the first two issues, United Rentals argues these explanations fail for the same reasons they advanced as to Juror No. 19. For the same reasons set out above, we conclude they fail here. As for the third issue, United Rentals argues Juror No. 29, a black female, answered the same way, was not struck by appellees, and was seated on the jury.

The record shows that appellees' counsel asked the venire panel if anyone had strong feelings about someone who invokes his/her Fifth Amendment rights and does not answer questions in a lawsuit like this. Two jurors, both outside the strike zone, voiced skepticism before Juror No. 24 opined:

> [Juror No. 24]: Generally, if somebody says they're pleading the Fifth, I automatically assume they're trying to hide something.
>
> [Plaintiffs' Counsel]: Yeah. No matter what the evidence is in this case, you just assume they're trying to hide something.
>
> [Juror No. 24]: Yes.

Counsel then asked if others agreed with Juror No. 24, "if they take the Fifth, they got to be hiding something." Nine jurors responded, most of whom were outside the strike zone. One, however, was a black female who was seated on the

67

jury.  She did not, however, indicate that was her opinion regardless of the evidence, as Juror No. 24 did.

**Juror No. 28**

Appellees identified multiple reasons for striking Juror No. 28:  (1) he was a writer and wrote thrillers and their jury consultant was concerned he would "want to write about this case, and there's a chance he's not going to write good things about it," (2) he previously served on two juries, and (3) he did not directly answer their questions and, on his questionnaire, he answered "depends" as to "everything," so they did not have enough information and did not want to take a chance on him. Again, each reason is facially race– and gender–neutral.  *See Davis*, 268 S.W.3d at 521 (juror occupation); *United States v. Cure*, 996 F.2d 1136, 1138 (11th Cir. 1993) (prior jury service); *Moore v. State*, 265 S.W.3d 73, 86 (Tex. App.—Houston [1st Dist.] 2008) (failing to completely fill out questionnaire), *pet. dism'd, improvidently granted*, 286 S.W.3d 371 (Tex. Crim. App. 2009) (per curiam).

On appeal, United Rentals challenges the first two reasons as "inconsistent and pretextual" because, if Juror No. 28 wrote "thrillers" and viewed personal injury cases as such, he "undoubtedly would have written about the prior personal injury case in which he served as juror.  But he didn't."  Even if we accept the argument, which we do not, United Rentals has not directed us to anything in the record to

68

indicate (1) anything about the facts of the prior civil case (motor accident with injury) and (2) that he did not write about it.

As for the questionnaire, United Rentals argues that seven panel members in the strike zone provided similar answers but were not struck. One of the members, however, was struck for cause. Of the remaining, we agree some provided no opinion on some of the questions regarding personal injury lawsuits and damages. But, as explained previously, when a party has offered multiple race-neutral explanations for its challenge, we cannot say that the fact that there were other acceptable jurors possessing one or more of these objectionable attributes is sufficient to establish disparate treatment. *See Cantu*, 842 S.W.2d at 689. Rather, we accord great deference to the trial judge to assess the credibility of the party and his explanations. *Id.*

In sum, to the extent the statistical disparity might show more than mere happenstance in the exclusion of whites and males from the jury, a comparative analysis does not. For the most part, appellees identified multiple reasons for their strikes and, as the trial court found, the record and relevant circumstances do not reveal pretext.

## D. Other Factors

Courts have considered other factors, when relevant, such as the history of the State's peremptory strikes in the past and use of a jury shuffle. *Davis*, 268 S.W.3d

69

at 513–14. These factors are not at play here. But we would be remiss if we did not mention the trial court's skepticism of United Rentals' motives in advancing this challenge in the first place. The trial judge believed that United Rentals' challenge was made in retaliation of her directive for the defense to turn over its jury notes to the court reporter and its desire for appellees to "turn over their notes" as well. Most telling was counsel's remark that "all of this is ridiculous but if we're doing it, might as well have both sides do it." Counsel's remarks, set out more fully earlier in this opinion, support the trial judge's concern that the strikes were made not because of constitutional imperatives but for retaliatory purposes. Certainly, this weighed in the balance of her consideration of the totality of the circumstances.

Having considered the record and all relevant circumstances, we conclude the trial court did not abuse its discretion in overruling United Rentals' *Batson* challenges to appellees' strikes. We overrule the second issue.

CONCLUSION

In sum, we conclude the evidence was legally and factually sufficient to support the jury's findings on negligence and Davis's conscious pain and suffering. Moreover, United Rentals has failed to show the trial court erred in its rulings regarding evidence, the jury charge, and *Batson* issues.

70

We affirm the trial court's judgment.


/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE



Evans, J., Schenck, J. dissenting from the denial of request for en banc consideration


180665F.P05

71



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

UNITED RENTALS NORTH
AMERICA, INC., Appellant

No. 05-18-00665-CV      V.

PAMELA EVANS,
INDIVIDUALLY AND AS
ADMINISTRATOR FOR THE
ESTATE OF CLARK BRANDON
DAVIS, AND DOMINIC JONES,
Appellees

On Appeal from the 191st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-15-04449.
Opinion delivered by Justice
Reichek; Justices Pedersen, III and
Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees PAMELA EVANS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF CLARK BRANDON DAVIS, AND DOMINIC JONES recover their costs of this appeal from appellant UNITED RENTALS NORTH AMERICA, INC.

Judgment entered August 18, 2020.